# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION | ) ) | Case No. 1:17-cv-02283 |
| | ) | |
| Plaintiff, | ) | Honorable Matthew F. Kennelly |
| | ) | |
| v. | ) | Magistrate Judge Kim |
| | ) | |
| REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS'MEMORANDUM OF LAW IN SUPPORT OF THEIR
## <u>MOTION FOR SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..........................................................**Error! Bookmark not defined.**

I.    INTRODUCTION ....................................................................................1

II.    STATEMENT OF FACTS......................................................................1

    A.    Revolution and Its Diesel Test Product. ....................................1

    B.    Barry and Joshua's Roles as CEO and President with Revolution............................3

    C.    The Diesel Test Domains ...........................................................3

III.    ARGUMENT...........................................................................................4

    A.    Curry has Introduced No Evidence of Individual Liability on Any Count. ..............4

        1.    The Undisputed Evidence Shows Barry and Joshua Acted Only as Officers of Revolution and Curry Failed to Make Any Special Showing. ...................4

        2.    Curry Failed to Pierce the Corporate Veil. ....................................7

    B.    The Undisputed Facts Establish Defendants Are Not Liable for Violations of the Anti-Cybersquatting Consumer Protection Act.........................................10

        1.    Defendants Did Not Register, Traffic in, or Use Any of the Diesel Test Domains at Issue nor Was "Diesel Test" Distinctive or Famous. ...............11

            a)    *Defendants are not labile for violating the ACPA for the domains without the term "diesel test".*..........................................13

            b)    *Defendants are not liable for violating the ACPA for the Diesel Test domains.* ...........................................................14

        2.    The Undisputed Evidence Establish Defendants Did Not Register, Traffic, or Use Any of the Diesel Test Domains at Issue with Bad Faith Intent to Profit. ........................................................16

    C.    The Undisputed Facts Establish Plaintiff Failed to Prove Any Damages for Any Violations Under Counts I or III....................................................19

        1.    Curry Is Not Entitled to Damages Under 15 U.S.C. § 1117(a). ...................19

            a)    *Curry failed to meet his burden to provide evidence of his lost sales.* ..................................................................19

            b)    *The undisputed evidence shows Revolution did not profit from the sales of the Diesel Test product.* ......................................20

2.      Curry is Not Entitled to Statutory Damages Related to Revolution's
        Trademark Infringement Under Count III Because Revolution's Use of the
        Diesel Test Trademark Does Not Constitute Counterfeiting........................21

3.      Revolution's Infringement Was Not Willful Pursuant to 15 U.S.C. § 1117
        Because
        It Reasonably Relied on the Advice of Counsel. ...........................................22

4.      The Undisputed Evidence Shows Curry Has Not Suffered Damages Under
        Count I
        for Violations of the Illinois Consumer Fraud and Deceptive Practices Act.
        ...................................................................................................................23

5.      There is No Triable Issue of Fact on Count V (Common Law Trademark
        Infringement) Because the Parties Entered into an Injunction. ....................24

6.      There is No Triable Fact on Count II for Violations of the Uniform
        Deceptive Trade Practice Act Because the Parties Entered into an Injunction.
        ...................................................................................................................25

IV.     CONCLUSION .................................................................................................25

CERTIFICATE OF SERVICE ...........................................................................................26

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Acad. Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*,
   No. CV 10-3738 ABC, 2010 WL 11463697 (C.D. Cal. Sept. 20, 2010) .................................. 15

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...................................................................................................... 4

*Beta Soft Sys., Inc. v. Yosemite Group, LLC*,
   No. 2:16-cv-01748-GMN-VCF, 2017 WL 3707393 (D. Nev. Aug. 25, 2017).......................... 8

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
   174 F.3d 1036 (9th Cir. 1999) ...................................................................................... 13

*Cooper Indus. Inc. v. Juno Lighting Inc.*,
   1 U.S.P.Q.2d 1313 (N.D. Ill. 1986) ................................................................................. 5

*Daimler AG v. A-Z Wheels LLC*,
   334 F.Supp.3d 1087 (S.D. Cal. 2018) .............................................................................. 5

*Dangler v. Imperial Mach. Co.*,
   11 F.2d 945 (7th Cir. 1926) ....................................................................................... 5, 6

*Deckers Outdoor Corp. v. Does 1-100*,
   No. 12 C 10006, 2013 WL 169998 (N.D. Ill. Jan. 16, 2013) .................................................. 10

*Desmond v. Chicago Boxed Beef Distributors, Inc.*,
   921 F. Supp. 2d 872 (N.D. Ill. 2013)................................................................................ 22

*Drink Group, Inc. v. Gulfstream Communications, Inc.*,
   7 F.Supp.2d 1009 (N.D. Ill. 1998)................................................................................... 5

*Ecklund v. Nev. Wholesale Lumber Co.*,
   93 Nev. 196 (Nev. 1977) .............................................................................................. 9

*Flentye v. Kathrein*,
   485 F.Supp.2d 903 (N.D. Ill. 2007)................................................................................ 15

*Ford Motor Co., Inc. v. Greatdomains*,
   177 F.Supp.2d 635 (E.D. Mich. 2001) ........................................................................ 12, 15

*Fuccillo v. Century Enterprises, Inc.*,
   No. 8:18-cv-1236-T-36AEP, 2019 WL 11648480 (M.D. Fla. Mar. 8, 2019) .................... 12, 15

*GoPets Ltd. v. Hise*,
   657 F.3d 1024 (9th Cir. 2011) ...................................................................................... 11

*Greenberg v. United Airlines*,
    206 Ill. App. 3d 40 (1st Dist. 1990) ........................................................................ 25

*H-D U.S.A., LLC v. SunFrog, LLC*,
    311 F. Supp. 3d 1000 (E.D. Wis. 2018) ................................................................. 22

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
    No. C-92-3330 DLJ, 1995 WL 552168 (N.D. Cal. Aug. 30, 1995) .......................... 5

*JSA, LLC v. Golden Gaming, Inc.*,
    No. 58074, 2013 WL 5437333 (Nev. Sept. 25, 2013) ............................................... 8

*King Ranch, Inc. v. King Ranch Contractors, LLC*,
    No. 6:12-cv-597-Orl-37KRS, 2013 WL 2371246 (M.D. Fla. May 30, 2013) ........ 12

*L.G. v. 8th Jud. Dist. Ct, ex rel. County of Clark*,
    133 Nev. 730 (Nev. 2017) ........................................................................................ 9

*Lemon v. Harlem Globetrotters Intern., Inc.*,
    437 F.Supp.2d 1089 (D. Ariz. 2006) ........................................................................ 6

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
    97 F.Supp.3d 485 (S.D.N.Y. 2015) ........................................................................... 6

*Lucas Nursery and Landscaping, Inc. v. Grosse*,
    359 F.3d 806 (6th Cir. 2004) .................................................................................. 11

*Merck Eprova AG v. Brookstone Pharm., LLC*,
    920 F.Supp.2d 404 (S.D.N.Y. 2013) ......................................................................... 6

*Microsoft Corp. v. V3 Solutions, Inc.*,
    No. 01 C 4693, 2003 WL 22038593 (N.D. Ill. Aug. 28, 2003) ................................. 5

*Multifab, Inc. v. ArlanaGreen.com*,
    122 F.Supp.3d 1055 (E.D. Wash. 2015) ................................................................. 13

*Oliveira v. Amoco Oil Co.*,
    201 Ill.2d 134 (Ill. 2002) ........................................................................................ 24

*Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*,
    754 F.2d 738 (7th Cir. 1985) .................................................................................. 20

*Panther Pumps & Equip. Co., v. Hydrocraft, Inc.*,
    468 F.2d 225 (7th Cir. 1972) .................................................................................... 5

*Peaceable Planet, Inc. v. TY, Inc.*,
    185 F.Supp.2d 893 (N.D. Ill. 2002) .......................................................................... 5

iv

*Petty v. Chrysler Corp.*,
    343 Ill.App.3d 815 (1st Dist. 2003) ........................................................................ 24

*Pharmaplast S.A.E. v. Zeus Med. Holdings, LLC*,
    No. 2:15-cv-002432-JAD-PAL, 2017 WL 985646 (D. Nev. Mar. 14, 2017) ........................ 7, 9

*Powder Power Tool Corp. v. Powder Actuated Tool Co.*,
    230 F.2d 409 (7th Cir. 1956) ........................................................................ 5

*Ramada Franchise Sys., Inc. v. Boychuk*,
    283 F.Supp.2d 777 (S.D.N.Y. 2003) ........................................................................ 6

*Rock-A-Bye Baby, Inc. v. Dex Prod., Inc.*,
    867 F.Supp. 703 (N.D. Ill. 1994) ........................................................................ 4

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
    978 F.2d 947 (7th Cir. 1992) ........................................................................ 22

*Schaut & Sons Inc. v. Mountain Log Homes Inc.*,
    No. 01-C-801, 2004 WL 1468538 (E.D. Wis. May 12, 2004) ................................................ 19

*Spiegel v. EngageTel Inc.*,
    372 F.Supp.3d 672 (N.D. Ill., 2019) ........................................................................ 23

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,
    202 F.3d 489 (2d Dist. 2000) ........................................................................ 17

*Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*,
    77 F.3d 928 (7th Cir. 1996) ........................................................................ 8

*Texas Intern. Prop. Assocs. v. Hoerbiger Holding AG*,
    624 F. Supp. 2d 582 (N.D. Tex. 2009) ........................................................................ 17

*Thrasher-Lyon v. Illinois Farmers Ins. Co.*,
    861 F.Supp.2d 898 (N.D. Ill. 2012) ........................................................................ 24

*Truck Ins. Exchange v. Palmer J. Swanson, Inc.*,
    124 Nev. 629 (Nev. 2008) ........................................................................ 8

*Ty, Inc. v. Softbelly's, Inc.*,
    No. 00 C 5230, 2007 WL 734394 (N.D. Ill. Mar. 6, 2007) ................................................ 23

*Vulcan Golf, LLC v. Google Inc.*,
    726 F.Supp.2d 911 (N.D. Ill. 2010) ........................................................................ 11, 12, 14, 16

*Webb v. Shull*,
    270 P.3d 1266 (Nev. 2012) ........................................................................ 8

*WFTV, Inc. v. Maverik Prod. Ltd. Liab. Co.*,
   No. 6:11-cv-1923-Orl-28KRS, 2012 WL 12906175 (M.D. Fla. Dec. 27, 2012) ...................... 12

**Statutes**

15 U.S.C. § 1116(d)(1)(B)(i) ............................................................................................. 21

15 U.S.C. § 1116(d)(1)(B)(ii) ............................................................................................ 22

15 U.S.C. § 1117 ................................................................................................................. 22

15 U.S.C. § 1117(a) ........................................................................................... 19, 20, 21, 25

15 U.S.C. §1117(c) ............................................................................................................. 25

15 U.S.C. § 1125(d)(1)(B)(i) ............................................................................................. 17

15 U.S.C. § 1125(d)(1)(B)(ii) ............................................................................................ 18

15 U.S.C. § 1125(d)(1)(E) .................................................................................................. 15

15 U.S.C. § 1125(d) ........................................................................................................... 10

815 ILCS 505/1. .................................................................................................................. 23

Fed. R. Civ. P. 56(a), (c) ..................................................................................................... 4

Nev. Rev. Stat. §78.747(1) .................................................................................................. 8

Nev. Rev. Stat. §78.747(2) .................................................................................................. 9

Nev. Rev. Stat. §78.747(3) .................................................................................................. 9

Nev. Rev. Stat. §86.371 ....................................................................................................... 7

## I.    INTRODUCTION

This case concerns allegations of trademark infringement. The issue before this Court on summary judgement is (1) whether Barry Nussbaum and Joshua Nussbaum are individually liable for all Counts, (2) whether Revolution Laboratories, LLC is liable for the remaining Counts (I, II, and VI), (3) whether Revolution Laboratories, LLC's trademark infringement was willful, (4) whether Curry is entitled to damages for Count I and III, and (5) whether there is a triable issue of fact on Counts II and V.

## II.   STATEMENT OF FACTS

### A.    Revolution and Its Diesel Test Product.

Revolution Laboratories, LLC ("Revolution") is a Nevada company that was formed and founded on August 4, 2012 by Joshua Nussbaum, Barry Nussbaum, and Terry Moncada to engage in the business of manufacturing and selling nutritional supplements. (SMF ¶¶ 1, 2). At all relevant times, it has been wholly owned by Rev Labs Management, Inc., NNE, LLC and LT Holdings, LLC. (SMF ¶¶ 2-3). Neither Barry Nussbaum (Revolution's CEO) nor Joshua Nussbaum (Revolution's President) has ever owned any membership interest in Revolution. (SMF ¶ 3). While Revolution currently has only 4 employees, it employed up to 40 people during the relevant time of 2016 – 2017. (SMF ¶ 4). Particularly, Revolution employed "exec team"/"leadership group" which was made up of Barry Nussbaum, Joshua Nussbaum, Galina Polyakova, Elizabeth Corvino, and Donna Godwin. (SMF ¶ 4). Revolution also employed Martha Pacheo, Alexandria Roemer, and Joshua Nussbaum who were responsible for maintaining, creating content for, and posting content for Revolution's social media, James Edson who handled product sales to retailers and distributors, and Andrew Zachar who handled the processing of product orders received from revlabs.com, Amazon, and eBay. (SMF ¶¶ 5, 10, 11).  During 2016 – 2017, Revolution also employed various individuals who made up the sales team and a finance department.  (SMF ¶ 6, 7).

1

In 2016, Revolution introduced a product called "Diesel Test Red Series, All-Natural Testosterone Booster" which Revolution marketed and sold as "Diesel Test." (SMF ¶ 29). Revolution sold the Diesel Test product primarily through Amazon.com, eBay, its own website (www.boostedtestforyou.com), and over the phone/email from October of 2016 through October of 2017 when all sales ceased. (SMF ¶¶ 29, 32).

Plaintiff, Charles Curry d/b/a Get Diesel Nutrition ("Curry") asserts that he owns common law "Diesel" trademarks (Dkt. 1, ¶ 16) and has sold some products named "Diesel Test Pro Cycle" and "Diesel Test Hardcore" (the "Curry Products"). (SMF ¶¶ 47, 48). Curry's trademarks for DIESEL FUEL became a registered trademark on January 8, 2019. and DIESEL became a registered trademark on February 11, 2020. (SMF ¶ 47). However, Curry has not provided any documents that show he has actually sold any of the Curry Products. (SMF ¶ 48). Even if he had sold the Curry Products at some time, Curry has not produced any evidence that he continued to sell the Curry Products from 2016 to 2017. (SMF ¶¶ 48, 50). In any case, prior to Revolution's choosing the name "Diesel Test," and selling products bearing that trademark, none of the Revolution employees were aware of the Curry Products or the rights asserted by Curry. (SMF ¶ 53).

Revolution's first awareness of Curry came in November 2016, when Curry sent a Facebook message and an email letter to Revolution claiming to own a trademark for "Diesel Test." (SMF ¶ 53). Shortly thereafter, Revolution's President, Joshua Nussbaum, contacted the company's counsel, Mr. Jeffrey Santos, and asked him to validate Curry's claims. (SMF ¶ 54). Revolution's counsel informed Revolution that Curry did not own a federal trademark registration for "Diesel Test" and that Revolution could continue to sell its Diesel Test product. (SMF ¶ 56). On February 16, 2017 Curry filed a complaint with Amazon.com which resulted in Revolution's listing for Diesel Test being disabled. (SMF ¶ 31). On October 21, 2017 Revolution re-branded its Diesel Test product as

RT2.0. (SMF ¶ 30). As of October 21, 2017, Revolution ceased all sales of its Diesel Test product. (SMF ¶¶ 29, 30).

### B. Barry and Joshua's Roles as CEO and President with Revolution.

Joshua Nussbaum has held the title of President of Revolution since 2013. (SMF ¶ 12). Joshua Nussbaum's responsibilities include managing the day-to-day operations, such as handling the growth and direction of the company, product development, recruiting social media and in-person ambassadors, and hiring employees. (SMF ¶ 12). Joshua's duties also entailed management of the executive members of the company and working with the company's CFO Galina Polykova on financial matters. (SMF ¶ 12). Barry Nussbaum has held the title of CEO at Revolution since 2012. (SMF ¶ 16). His duties entail the entity formation, and acting as a mentor; he has only been involved in decisions of major magnitude. (SMF ¶ 17). Barry was not involved with managing who was doing what within Revolution. (SMF ¶¶ 18, 19). Neither Barry nor Joshua owns any shares of Revolution. (SMF ¶¶ 15, 22). Neither Joshua nor Barry Nussbaum was responsible for sales of the Diesel Test Product. (SMF ¶ 23). Neither Joshua nor Barry Nussbaum personally sold any Diesel Test Product. (SMF ¶ 23). Neither Barry Nussbaum nor Joshua Nussbaum was involved in managing, hiring, or tracking the affiliate networks; Galina Polykova was responsible for the affiliate networks. (SMF ¶ 8). Curry named Barry Nussbaum as a defendant in this lawsuit solely because of his title of CEO. (SMF ¶ 28). Curry named Joshua Nussbaum as a defendant in this lawsuit solely because he holds the title of President at Revolution. (SMF ¶ 28).

### C. The Diesel Test Domains

In the Complaint, Curry alleged that Defendants "own, control, or profit from" fourteen (14) websites. (SMF ¶ 59). Except for www.revlabs.com, Defendants are not the registrant of any of the domains identified in Curry's Complaint. (SMF ¶¶ 58, 61). Curry alleged that Defendants were the registrants of several other internet domains that included the phrase "Diesel Test" (the "Diesel Test

Domains"). (SMF ¶ 59). Defendants are not the registrant of the Diesel Test Domains. (SMF ¶¶ 58, 61, 64, 75).

Top Source Media ("TSM") is the registrant of the following internet domains: *dieseltest.net, dieseltest.org, dieseltestpro.com, dieseltestmuscle.net, dieseltestpro.net, dieseltestmuscle.com, dieseltesto.org, and dieseltesto.net*. (SMF ¶ 64). Defendants never spoke with, communicated with, or had knowledge of TSM or its registrations or uses of any internet domains. (SMF ¶¶ 66-68, 71, 72, 74). Robert Estores d/b/a Chaotek Media ("Estores") is the registrant of the following internet domains: *dieseltestt.com* and *dieseltesto.com.* (SMF ¶ 76). Defendants never spoke with, communicated with, or had knowledge of Estores or its registrations or uses of any internet domains. (SMF ¶ 77).

## III.    ARGUMENT

Summary judgment is proper if the movant shows through materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, and interrogatory answers, that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). "Summary judgment is appropriate against a party who fails to make a sufficient showing to establish the existence of an essential element to its case on which that party will bear the burden of proof at trial." *Rock-A-Bye Baby, Inc. v. Dex Prod., Inc.*, 867 F.Supp. 703, 706 (N.D. Ill. 1994) citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### A.    Curry has Introduced No Evidence of Individual Liability on Any Count.

#### 1.    The Undisputed Evidence Shows Barry and Joshua Acted Only as Officers of Revolution and Curry Failed to Make Any Special Showing.

Long ago, the United States Court of Appeals for the Seventh Circuit established the standard

for holding a corporate officer liable for direct trademark infringement:

> [I]n the absence of some **special showing**, the managing officers of a corporation are **not liable** for the infringements of such corporation, though **committed under their general direction**. . .
>
> It is when the officer acts **willfully and knowingly**— that is, when he **personally participates** in the manufacture or sale of the infringing article (**acts other than as an officer**), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability— that officers are held jointly with the company.

*Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926) (emphasis added). *Dangler* is still the law of the Seventh Circuit and has been applied to trademark and patent cases. *Peaceable Planet, Inc. v. TY, Inc.*, 185 F.Supp.2d 893, 896 (N.D. Ill. 2002). *See, e.g.*, *Panther Pumps & Equip. Co., v. Hydrocraft, Inc.,* 468 F.2d 225 (7th Cir. 1972) (holding officers personally liable only when acting outside the scope of their duties); *Powder Power Tool Corp. v. Powder Actuated Tool Co.,* 230 F.2d 409 (7th Cir. 1956); *Drink Group, Inc. v. Gulfstream Communications, Inc.,* 7 F.Supp.2d 1009 (N.D. Ill. 1998); *Cooper Indus. Inc. v. Juno Lighting Inc.,* 1 U.S.P.Q.2d 1313 (N.D. Ill. 1986).

If the officers act merely as officers, they are not liable jointly with the corporation. *Dangler*, 11 F.2d at 946. It is only when the officers act outside the scope of their official duties that they become liable. *Id.* at 946-47. Personal liability for trademark infringement and unfair competition require the plaintiff to establish that the corporate officer is "a moving, active[,] conscious force behind the defendant corporation's infringement." *Microsoft Corp. v. V3 Solutions, Inc.*, No. 01 C 4693, 2003 WL 22038593, at *13 (N.D. Ill. Aug. 28, 2003). The officer must "personally take part in infringing activities or specifically direct employees to do so." *Daimler AG v. A-Z Wheels LLC*, 334 F.Supp.3d 1087, 1106 (S.D. Cal. 2018) (internal citation omitted); *see Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, No. C-92-3330 DLJ, 1995 WL 552168 (N.D. Cal. Aug. 30, 1995) ("If an individual actively and knowingly caused the trademark infringement, he is personally

responsible."). Courts have found an employee to be the "moving force" behind a Lanham Act violation when he was primarily responsible for designing, marketing, and developing an infringing product, *Merck Eprova AG v. Brookstone Pharm., LLC,* 920 F.Supp.2d 404, 427 (S.D.N.Y. 2013), or otherwise "directly participated" in the violation, *Ramada Franchise Sys., Inc. v. Boychuk,* 283 F.Supp.2d 777, 788 (S.D.N.Y. 2003). *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F.Supp.3d 485, 501 (S.D.N.Y. 2015).

However, courts have also " 'consistently stated that a corporate executive will not be held vicariously liable for torts, merely by virtue of his office'." *Lemon v. Harlem Globetrotters Intern., Inc.*, 437 F.Supp.2d 1089, 1110 (D. Ariz. 2006), quoting *Murphy Tugboat Co. v. Shipowners & Merchs. Towboat Co.,* 467 F.Supp. 841, 854 (N.D.Cal.1979). Here, the undisputed material facts show that neither Barry nor Joshua Nussbaum acted in any capacity beyond their roles as officers of Revolution (SMF ¶¶ 8, 12, 17, 18, 23, 54, 56), and, both Barry's and Joshua's actions concerning Diesel Test were entirely within the scope of their roles as officers of Revolution. *See Dangler*, 11 F.2d at 947.

Barry Nussbaum was named as a defendant in this suit solely because he was CEO of Revolution, not because he committed any acts of infringement. (SMF ¶ 28). Defendants submit that Revolution's infringement cannot be attributed to Joshua Nussbaum nor Barry Nussbaum because such infringement was not committed by either of them or at their direction. As a matter of law, that is not sufficient to hold Joshua or Barry liable for Revolution's acts of infringement. *See Dangler*, 11 F.2d at 947. During 2016 – 2017, Revolution employed up to 40 people, which included an "exec team"/"leadership group", a sales team, a finance department, a team to decide on product names, and employees with specific jobs related to communications with the affiliate networks, handling the processing of Diesel Test orders, and handling sales with retailers and distributors. (SMF ¶¶ 4 –

11). Joshua Nussbaum's responsibilities, on the other hand, included managing the day-to-day operations, such as handling the direction of the company, coming up with products, recruiting ambassadors to represent Revolution on social media and in-person, hiring employees, and building out various divisions/groups of Revolution. (SMF ¶ 12). There is no evidence that either Joshua or Barry Nussbaum was responsible for sales of the Diesel Test product or ever directly or personally sold any Diesel Test product. (SMF ¶ 23).

Accordingly, the undisputed evidence confirms that neither Barry nor Joshua Nussbaum was the "moving force" behind the infringement of Curry's common law rights.[1] Instead, the actions of Revolution, the company for which they are officers, unbeknownst to them at the time, sold a product with a similar mark to Curry's Diesel Test trademark.

### 2.      Curry Failed to Pierce the Corporate Veil.

Revolution is organized in the State of Nevada under Chapter 86 of the Nevada Revised Statutes. (SMF, ¶ 2). Nev. Rev. Stat. §86.371 provides, "[u]nless otherwise provided in the articles of organization or an agreement signed by the member or manager to be charged, no member or manager of any limited-liability company formed under the laws of this State is individually liable for the debts or liabilities of the company." Revolution's organizing documents do not contain a provision saying its members are individually liable for the debts or liabilities of the company. (SMF ¶ 2). Additionally, neither Barry nor Joshua Nussbaum are members or managers of Revolution. (SMF ¶¶ 3, 25).

To hold Barry and Joshua individually liable for Revolution's liabilities, Curry must first pierce the corporate veil. *See Pharmaplast S.A.E. v. Zeus Med. Holdings, LLC*, No. 2:15-cv-002432-JAD-PAL, 2017 WL 985646, at *3 (D. Nev. Mar. 14, 2017) (finding the plaintiff must pierce the

---

[1] For the purposes of summary judgment, it is assumed that Curry owns a common law trademark for Diesel Test and that Revolution's products infringe that mark.

corporate veil of the limited liability company because the company's organizing document contains no provision). Because Revolution was organized under the laws of the State of Nevada, Nevada law (not Illinois) controls questions of veil piercing. *See Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 933 (7th Cir. 1996) ("Efforts to 'pierce the corporate veil' are governed by the law of the state of incorporation.").

The Nevada Supreme Court has not expressly held that the laws for piercing the corporate veil under the alter-ego doctrine apply to LLCs, but it has at least twice assumed without deciding that the alter-ego concepts that apply in Nevada corporate law also apply to Nevada LLCs. *See Webb v. Shull*, 270 P.3d 1266, 1271 n.3 (Nev. 2012); *see also JSA, LLC v. Golden Gaming, Inc.*, No. 58074, 2013 WL 5437333, at *5 (Nev. Sept. 25, 2013).

Courts there have held that "[t]he corporate cloak is not lightly thrown aside' and that the alter ego doctrine is an exception to the general rule recognizing corporate independence." *Truck Ins. Exchange v. Palmer J. Swanson, Inc.*, 124 Nev. 629, 635 (Nev. 2008) quoting *LFC Mktg. Grp, Inc. v. Loomis,* 116 Nev. 896, 903–04 (Nev. 2000). The effect of applying the alter ego doctrine is that the corporation and the individual who dominates it are treated as one "so that any act committed by one is attributed to both, and if either is bound, by contract, judgment, or otherwise, both are equally bound." *Beta Soft Sys., Inc. v. Yosemite Group, LLC*, No. 2:16-cv-01748-GMN-VCF, 2017 WL 3707393, at *2 (D. Nev. Aug. 25, 2017) (internal citation omitted).

Further, Nev. Rev. Stat. §78.747(1) provides that "[e]xcept as otherwise specifically provided by statute or agreement, no person other than a corporation is individually liable for a debt or liability of the corporation unless the person acts as the alter ego of the corporation. A person acts as the alter ego of a company only if (a) the corporation is influenced and governed by the individual, (b) the corporation and the individual are inseparable from each other through unity of interest and

ownership, and (c) adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice. Nev. Rev. Stat. §78.747(2). "The question of whether a person acts as the alter ego of a corporation must be determined by the court as a matter of law." Nev. Rev. Stat. §78.747(3). "Each of the above three elements must be established by a preponderance of the evidence by the party seeking to pierce the corporate veil." *Ecklund v. Nev. Wholesale Lumber Co.*, 93 Nev. 196, 197–98 (Nev. 1977). Although "there is no litmus test for determining when the corporate fiction should be disregarded," factors including: "(1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities" may indicate the existence of an alter ego. *Pharmaplast*, 2017 WL 985646, at *3.

Here, Curry seeks to hold Joshua and Barry personally liable *solely* because of their titles as President and CEO at Revolution. (SMF ¶ 28). Merely holding the title of President or CEO at a company *does not* automatically make that individual liable for the corporation's wrongdoing for if that were the case, it would nullify the protections that incorporation provides. *See Gardner ex rel L.G. v. 8th Jud. Dist. Ct, ex rel. County of Clark*, 133 Nev. 730, 734 (Nev. 2017) (the act of managing an LLC in and of itself cannot result in personal culpability because this notion would be in conflict with the manager's limited liability).

For the reasons set forth in Section III(A)(1), *supra*, Curry cannot meet his burden to show that the corporation was influenced and governed solely by Joshua. Barry Nussbaum, although holding the title of CEO, had even less influence on the operations of Revolution; Barry did not have much insight of who was doing what within Revolution. (SMF ¶¶ 18, 19). Barry could not and did not overrule the decisions of the executive team. (SMF ¶ 19). Curry has failed to adduce any evidence to show that Barry or Joshua had or used any power to dominate and control Revolution.

Further, Curry failed to introduce any evidence that there is "such unity of interest" between Revolution and Joshua, or between Revolution and Barry so as to hold either liable for the company's actions. More specifically, Curry has not identified any evidence of (1) commingling of funds, (2) undercapitalization, (3) unauthorized diversion of funds, (4) treatment of corporate assets as the individual's own, and (5) failure to observe corporate formalities. The undisputed evidence shows the opposite: Barry, Joshua, and Revolution all have separate bank accounts. (SMF ¶ 27); Revolution's business credit card is Amex-MRX 93000, which is used to pay Revolution's bills and the like (SMF ¶ 26); and any non-business related, personal expense incurred by Joshua was considered an advance and was owed back to Revolution as a deduction against a profit percentage distribution in the future. (SMF ¶ 14).

Curry has not provided any evidence that would allow a finding of a fiction of separate corporate existence, or that this Court's recognition of the corporate form would sanction a fraud or promote injustice. Accordingly, because no disputed issues of material facts exist, Barry and Joshua Nussbaum are entitled to judgment in their favor on all counts of Curry's Complaint.

### B. The Undisputed Facts Establish Defendants Are Not Liable for Violations of the Anti-Cybersquatting Consumer Protection Act.

To state a claim under Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), the plaintiff must prove each of three distinct elements: "(1) [he] had a distinctive or famous mark *at the time the domain name was registered*, (2) the defendant[s] *registered, trafficked in, or used* a domain name that is identical or confusingly similar to plaintiff's mark, *and* (3) the defendant[s] had a *bad faith intent* to profit from that mark." *Deckers Outdoor Corp. v. Does 1-100*, No. 12 C 10006, 2013 WL 169998, at *4 (N.D. Ill. Jan. 16, 2013) (emphasis added) quoting *MasterCard Int'l Inc. v. Trehan,* 629 F.Supp.2d 824, 830 (N.D. Ill. 2009) quoting *Flentye v. Kathrein,* 485 F.Supp.2d 903, 914 (N.D. Ill. 2007). The ACPA was enacted to combat

10

"cybersquatting," which is "the bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another." *Vulcan Golf, LLC v. Google Inc.,* 726 F.Supp.2d 911, 915 (N.D. Ill. 2010) (quoting *Solid Host, NL v. Namecheap, Inc.,* 652 F.Supp.2d 1092, 1099 (C.D. Cal. 2009)). The undisputed evidence here demonstrates that none of the three elements are satisfied in this case and Defendants are entitled to judgment as a matter of law on Count VI of Curry's Complaint.

In the Senate Report accompanying the ACPA, "cybersquatters" are defined as those who: (1) "*register well-known brand names* as internet domain names in order to extract payment from the rightful owners of the marks;" (2) "*register well-known marks* as domain names and warehouse those marks with the hope of selling them to the highest bidder;" (3) "*register well-known marks* to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site;" (4) "target distinctive marks to defraud consumers, including *to engage in counterfeiting activities*." *Lucas Nursery and Landscaping, Inc. v. Grosse,* 359 F.3d 806, 809 (6th Cir. 2004) (emphasis added) quoting S.Rep. No. 106–140 at 5–6 (1999). Again, the evidence demonstrates that Defendants' actions do not satisfy any of the criteria evaluated by Congress in enacting the ACPA.

### 1. Defendants Did Not Register, Traffic in, or Use Any of the Diesel Test Domains at Issue nor Was "Diesel Test" Distinctive or Famous.

"The ACPA imposes liability on one who 'registers, traffics in, or uses' the allegedly infringing domain names." *Vulcan Golf,* 726 F.Supp.2d at 915 quoting 15 U.S.C. § 1125(d)(1)(A)(ii). The words "registration" and "register" are not defined in ACPA. *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011). However, the initial contract with the registrar constitutes a "registration" under ACPA. *Id.* The ACPA imposes liability for "using" a domain name only "if that person is the domain name registrant or that registrant's authorized licensee." *Vulcan Golf,* 726 F.Supp.2d at 916.

As provided in the ACPA, the term " 'traffics in' refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." *Id.* at 920. The phrase " 'traffics in' contemplates a direct transfer or receipt of ownership interest in a domain name to or from the defendant." *Ford Motor Co., Inc. v. Greatdomains,* 177 F.Supp.2d 635, 644–45 (E.D. Mich. 2001).

The ACPA defines a narrow universe of potential defendants; thus, if a defendant is neither the domain name registrant nor the registrant's authorized licensee, he or she cannot be liable for cybersquatting under the ACPA. *Fuccillo v. Century Enterprises, Inc.*, No. 8:18-cv-1236-T-36AEP, 2019 WL 11648480, at *4 (M.D. Fla. Mar. 8, 2019); *see also King Ranch, Inc. v. King Ranch Contractors, LLC*, No. 6:12-cv-597-Orl-37KRS, 2013 WL 2371246, at *3 (M.D. Fla. May 30, 2013) (dismissing an ACPA claim because the complaint did not contain factual allegations "regarding the identity of the domain name registrant or whether [the defendants were] that registrant's authorized licensee."); *WFTV, Inc. v. Maverik Prod. Ltd. Liab. Co.*, No. 6:11-cv-1923-Orl-28KRS, 2012 WL 12906175, at *1 (M.D. Fla. Dec. 27, 2012) (denying a motion for default judgment for a cause of action for cybersquatting where the plaintiff did not show that the defendant was the domain name registrant or its authorized licensee).

The undisputed facts establish that all factors weigh against a finding that Defendants violated the ACPA. First and foremost, Curry has introduced no evidence that his "Diesel Test" mark was distinctive in 2016. Similarly, Curry has introduced no evidence that the "Diesel Test" mark is or ever was famous, let alone famous at the time of registration of any of the Diesel Test Domains. Further, Curry has not introduced any evidence showing the identity of the registrants of the internet websites identified in Paragraph 25 of his Complaint that do not have the terms "diesel test" were Defendants. There is also no evidence of any licensor/licensee relationship between Defendants and

any of the other domains that Curry contends violate the ACPA. While Curry issued a staggering amount (approximately 20) of third-party subpoenas seeking information to try and establish a relationship between Defendants and the registrants of the Diesel Test Domains and the other domains Curry identified in this suit, the responses to those subpoenas and all of the evidence discovered in this case proves no such connection ever existed. (SMF ¶ 60). In fact, the registration documents relating to all of the domains identified by Curry (including the Diesel Test Domains) show that ***none*** were registered by Defendants. (SMF ¶ 60).

> a) *Defendants are not labile for violating the ACPA for the domains without the term "diesel test".*

"Each internet web page has a corresponding 'domain address' which is an identifier somewhat analogous to a telephone number or street address." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1044 (9th Cir. 1999). "Domain names consist of a second-level domain—simply a term or series of terms (*e.g.*, westcoastvideo)—followed by a top-level domain, many of which describe the nature of the enterprise." *Id.* "Top-level domains include ".com" (commercial), ".edu" (educational), ".org" (non-profit) and others." *Id.*

For domain numbers 2-9, 12, and 14 identified by Curry in Paragraph 25 of the Complaint, neither the top-level (*e.g.,* ".org" or ".com") nor second-level domain names incorporate Curry's "Diesel Test" mark or even the term "Diesel" at all. (SMF ¶ 59). Instead, Curry's "Diesel Test" mark is referenced elsewhere, such as among the alleged contents of the website (*e.g.*, the portion of the website link following the various "/" punctuation marks). Because the domains do not contain Curry's trademarks in either the top-or second-levels, there can be no violation of the ACPA. *See Multifab, Inc. v. ArlanaGreen.com*, 122 F.Supp.3d 1055, 1061,1067 (E.D. Wash. 2015) (finding no violations of the ACPA when defendant's website, arlanagreen.com, did not incorporate the plaintiff's trademarks for "Multifab" or "Multifab, Inc." in the top-level nor second-level domain

name). Accordingly, Defendants are entitled to judgment as a matter of law that they did not violate the ACPA in connection with the domains without "diesel test" identified in paragraph 25 of Curry's Complaint.

> b) *Defendants are not liable for violating the ACPA for the Diesel Test domains.*

The undisputed facts establish **none** of the Defendants are the registrants of the Diesel Test Domains. (SMF ¶¶ 58, 60, 64, 75). Further, **none** of the Defendants were involved in the registration of the Diesel Test Domains at any time. (SMF ¶¶ 65-68, 71-74, 77). Curry has failed to adduce any evidence that shows any of the Defendants registered any of the Diesel Test Domains listed in Paragraph 25 of the Complaint or any other Diesel Test Domain.[2] Defendants produced a list of every domain each of them owned and controlled, which shows that no Defendant is the registrant of any of the domains listed in Paragraph 25 of the Complaint or any other Diesel Test Domain. (SMF ¶ 58). Therefore, the undisputed facts establish that Defendants did not register the Diesel Test Domains and are not a "registrant of" the Diesel Test Domains at issue. *See Vulcan Golf*, 726 F.Supp.2d at 916 (finding defendant did not register the domain names and was not a "registrant of" the domain names at issue because the defendant "never registered the domains nor played a role in the registration of the domain names"). Accordingly, Defendants should be granted judgment in their favor.

Further, the undisputed evidence shows Defendants are not liable under the ACPA for "using" the Diesel Test Domains because (again) the Defendants are not the registrants, nor are Defendants the registrants' authorized licensees. Curry failed to provide any evidence that shows the existence of a license agreement between Defendants and any third-party registrant of the Diesel

---

[2] The domain, www.dieseltestboosted-red.com is not at issue with respect to Revolution. Revolution has stipulated to a violation of the ACPA. (SMF ¶ 80).

Test Domains (*e.g.*, TSM or Estores). Even more, the undisputed facts show that TSM and Estores did not have any contact with Defendants, were unaware of Defendants, and the affiliate marketers made an independent choice to register and create the domain names. (SMF ¶¶ 62, 63, 65-68, 71-74, 77). Because the undisputed facts establish that none of the Defendants are authorized licensees of the registrants, Defendants are not liable for "using" the allegedly infringing Diesel Test Domains. *See Flentye*, 485 F. Supp. 2d at 914–15 ("The ACPA does contain a specific provision (that does not apply to the Lanham Act generally) stating that '[a] person shall be liable for using a domain name ... *only if* that person is the domain name registrant or that registrant's authorized licensee.'") (emphasis added).

Unfortunately, many courts have not addressed the contours of what it means to "traffic in" a domain name under the ACPA. *Fuccillo v. Century Enterprises, Inc.*, No. 8:18-cv-1236-T-36AEP, 2019 WL 11648480, at *5 (M.D. Fla. Mar. 8, 2019). The court in *Ford*, concluded that under the plain meaning of the statute, the term 'traffics in' "contemplates a direct transfer or receipt of ownership interest in a domain name to or from the defendant." 177 F.Supp.2d at 645. The *Ford* court examined the definition of "traffic" used in 15 U.S.C. § 1125(d)(1)(E) and stated:

> The specific terms listed in this definition are susceptible to broad interpretation and, moreover, are merely illustrative. Nonetheless, the concluding catch-all phrase "any other transfer ... or receipt in exchange for consideration" provides the context in which they must be understood. Specifically, the language "any other transfer ... or receipt" clarifies that the defining terms are all ways in which a domain name may be transferred or received. The key words—"transfer" and "receipt"—both denote some level of ownership or control passing between the person transferring and the person receiving.

*Id.* Two later cases met this analysis with some criticism but did not provided an alternative holding or rationale. Both of those cases held that "licensing" was within the definition of trafficking and therefore, met the standard for trafficking. *See Acad. Motion Pictures Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-3738 ABC (CWx), 2010 WL 11463697, at *6 (C.D. Cal. Sept. 20, 2010) (failing to

provide a different reading of the statute because (1) the statute specifically includes licensing within the definition of trafficking, and the defendant was alleged to be the authorized licensee of the domain name, and (2) the plaintiff alleged that the defendant trafficked in the domain name because it received a fee every time an Internet user clicked on a link attached to an infringing domain name, which met the *Ford* reading of 'traffics in' because the *Ford* court included receipt of a fee as an ownership interest); *Vulcan Golf*, 726 F. Supp. 2d at 920-21 (declining to address the statutory definition of 'traffics in' because it already concluded that the defendant could constitute a licensee of the domain name).

Here, under any judicial definition the undisputed evidence shows Defendants are not authorized licensees of the third parties who, independently of Defendants, registered and created the Diesel Test Domains. (SMF ¶¶ 62-68, 71-75, 77). Defendants have not been transferred, nor received any ownership interest in any of the Diesel Test Domains. (SMF ¶ 78). Further, no evidence exists that shows Defendants earned a fee from either TSM or Estores. Therefore, Defendants are entitled to judgment that they did not traffic in any of the Diesel Test Domains. Because the Defendants did not register, use, or traffic in the Diesel Test Domains, Defendants are entitled to judgment on Count VI of Curry's Complaint that they did not violate the ACPA.

**2.      The Undisputed Evidence Establish Defendants Did Not Register, Traffic, or Use Any of the Diesel Test Domains at Issue with Bad Faith Intent to Profit.**

Even if the Court were to find or assume that the Defendants registered, trafficked in, or used the Diesel Test Domains, the evidence shows that any such action was not made with a bad faith intent to profit.[3] The ACPA lists the nine non-exhaustive factors to assist a court with the third

---

[3] For purposes of argument in Section III(B)(2) only, Defendants will assume that they registered, trafficked in, or used the Diesel Test Domains. As discussed in Section III(B)(1) *supra*, the undisputed evidence shows Defendants did not register, traffic, or use any of the Diesel Test Domains.

element of bad faith intent to profit. *See* 15 U.S.C. § 1125(d)(1)(B)(i). Courts are not limited to considering just the listed factors when making a determination of whether the statutory criterion has been met. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 498 (2d Dist. 2000). The factors are, instead, expressly described as indicia that "may" be considered along with other facts. *Id.* The most important grounds for finding bad faith "are the unique circumstances of th[e] case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute." *Id.* at 499. Describing the analysis another way, other courts have emphasized that a bad faith determination under ACPA should be made with regard to the totality of the circumstances. *Texas Intern. Prop. Assocs. v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 590 (N.D. Tex. 2009). Here, the majority of the ACPA factors for determining bad faith do not apply. Further, Defendants' "unique circumstances" do not fit neatly into the nine factors and the totality of the circumstances do not warrant a finding of bad faith. While it is true that Revolution began selling its Diesel Test product starting October 14, 2016, (SMF ¶ 29), at that time, Revolution was entirely unaware of either Curry or any rights Curry may have had. (SMF ¶ 53). Defendants only learned of Curry and Curry's alleged trademarks when Curry sent his cease-and-desist communications on November 13 and 15 of 2016. (SMF ¶ 53). That alone militates against a finding of "bad faith."

Further, the sixth, seventh, and ninth factors weigh strongly against finding bad faith existed. Curry provided no evidence that his trademarks are famous or well-known to the general public. *See Texas Intern.*, 624 F. Supp. 2d at 591 (finding that because the HOERBIGER mark is not famous or well-known to the general public, the ninth factor weighs against bad faith.). In fact, Curry even dismissed his dilution claim because he could not establish the requisite fame element. (*See* Dkt. 133). Curry has provided no evidence that: (1) Defendants offered to transfer, sell, or otherwise

assign any domain name to Curry for financial gain, (2) Defendants provided false contact information when applying for the registration of any Diesel Test Domain, or (3) that the Defendants failed to maintain accurate contact information. Therefore, factors six and seven weigh against a finding of bad faith. Even more, Curry has provided no evidence that Defendants ever intended to or actually did divert consumers from *Curry's* website.

Finally, the ACPA includes a "safe harbor" provision that provides that bad faith "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). Here, the safe harbor provision clearly applies. Defendants were unaware of Curry's claims to own a trademark for "Diesel Test". At the time Revolution began selling its Diesel Test Product, Curry did not own any federal trademark registration (and currently does not) or pending trademark application for "Diesel Test". (SMF ¶ 47). Also, upon receiving Curry's November 2016 communications through Facebook and email, Joshua Nussbaum contacted Revolution's attorney, Jeffrey Santos, to evaluate Curry's legal claims. (SMF ¶¶ 54, 56). Mr. Santos told Revolution that Curry did not have any rights in the mark "Diesel Test" and that Revolution could continue selling its products. (SMF ¶ 56). Mr. Santos and Revolution employees searched Amazon and asked distributors, other business, and athletes if anyone is familiar with Curry or Curry's Products. (SMF ¶ 57). Revolution could not find Curry nor Curry's Products ranked on Amazon nor had anyone in the business ever heard of Curry or Curry's Products. (SMF ¶ 57). Revolution also reasonably relied on the advice of its counsel. Accordingly, Defendants are entitled to judgement as a matter of law that they did not violate the ACPA in connection with the Diesel Test Domains.

**C.** **The Undisputed Facts Establish Plaintiff Failed to Prove Any Damages for Any Violations Under Counts I or III.**

**1.** **Curry Is Not Entitled to Damages Under 15 U.S.C. § 1117(a).**

Pursuant to 15 U.S.C. § 1117(a), the owner of a mark is entitled to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action for a violation of the federally registered trademark. By law, Curry is precluded from recovering damages.

a) *Curry failed to meet his burden to provide evidence of his lost sales.*

"A plaintiff wishing to recover damages for a violation of the Lanham Act must prove . . . that the plaintiff suffered actual injury, *i.e.*, a loss of sales, profits, or present value (goodwill)." *Schaut & Sons Inc. v. Mountain Log Homes Inc.*, No. 01-C-801, 2004 WL 1468538, at *6 (E.D. Wis. May 12, 2004) (internal citation omitted). Moreover, a higher standard of proof is required for the grant of money damages. *Id*. In order to recover damages for lost profits, a plaintiff must show something more than a decline in sales. *Id*. Here, Curry has provided no evidence that shows any decline in sales caused by the infringement. (SMF ¶¶ 48-51). Curry did not produce, because he does not possess, any documents that show any lost sales. (SMF ¶ 48).

During Curry's deposition, when asked about his purported sales of Curry's Products, Curry stated he does not have any records showing (1) the unit of sales for either product; (2) sales from [his sales channels] A1 Supplement, DPS, or Amazon; and (3) the dollars from sales earned. (SMF ¶¶ 48-51). Accordingly, Curry failed to establish what sales of Curry's Products, if any, were made. Because Curry could not and did not establish his own sales, he has failed to establish any lost sales supposedly caused by confusion between Curry's Products and Revolution's Diesel Test product. In view of the undisputed facts, Curry failed to show any amount of lost sales whatsoever, let alone caused by the infringement, and therefore, Defendants are entitled to judgment in their favor pursuant to §1117(a) awarding Curry $0 in damages.

19

> **b)** *The undisputed evidence shows Revolution did not profit from the sales of the Diesel Test product.*

To force the defendant to disgorge the profits obtained because of the infringement, § 1117(a)(1) requires, "the plaintiff...to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed" in determining the profit derived from the sale. *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985) (internal citation omitted). The defendant may show that his infringement was not profitable. *Id.* Here, just like in *Otis Clapp & Son*, Defendants did not profit from the allegedly infringing acts.[4]

The only product at issue is the Diesel Test product. During discovery, Revolution produced its Profit and Loss statement created specifically for its Diesel Test Product. (SMF ¶ 35). According to that document, Revolution's gross sales for its Diesel Test product was ███████[5], which included (a) all Diesel Test Product sales made through Revolution (aka "Old Co."), LuxeFit (aka "New Co."), and Elite Wellness, LLC; (b) all Diesel Test Product sales made through www.boostertestforyou.com, www.testoboosterpro.com, www.dieseltestbooster-red.com, and www.revlabs.com (c) all Diesel Test Product sales made through Amazon and eBay, (d) all third-party affiliate websites selling the Diesel Test Product, (e) all straight sales of the Diesel Test Product; (f) all re-bills and monthly charges for the Diesel Test Product; and (g) all sales of the Diesel Test Product to distributors and retailers. (SMF ¶ 36). Further, Revolution's total income for the Diesel Test Product was ███████, which subtracts Revolution's refunds and returns ███████ chargebacks (████), and merchandise returns (██████) from Revolution's gross sales. (SMF

---

[4] It is indisputable that Defendants Barry Nussbaum and Joshua Nussbaum did not profit from any of the alleged infringement. (SMF ¶¶ 13, 15, 21, 22, 25). Revolution stipulated to infringement of the common law trademarks. (Dkt. 156).

[5] Defendants designated its Profit and Loss statement as "Confidential – Subject to Protective Order" because it contains confidential commercial information. Contemporaneously herewith, Defendants files a motion for leave to file this Memorandum, Statement of Material Facts, and Exhibits 3, 7, and 8 under seal. The highlighted texts have been redacted from the public version of this Memorandum.

¶ 37). Revolution's total gross profit of the Diesel Test product is calculated by taking the total income ███████ and subtracting the total costs of goods sold (███████) for a total of ███████. (SMF ¶¶ 38, 39). Accordingly, the undisputed facts show that Revolution's sales, for purposes of §1117(a)(1) was ███████ (SMF ¶ 39).

Revolution met its burden to show its costs and deductions.[6] Revolution's total expenses incurred for its Diesel Test Product from October 2016 to October 2017 was ███████, which included expenses for consumer chargeback services (████), total computer software and internet expenses (████), payroll expenses (██████), total marketing expenses (██████), total merchant processing fees (██████), and shipping and delivery expenses (█████. (SMF ¶¶ 40-45). The evidence shows that Revolution *lost* ██████ in connection with its Diesel Test Product because its costs and expenses ███████ were greater than its gross profits ██████. (SMF ¶ 46).

Curry did not question the veracity of the Profit and Loss Statement during the depositions of Barry or Joshua Nussbaum and Curry completely ignored the topic when questioning Revolution's designated witness pursuant to Rule 30(b)(6). Based on Revolution's unrebutted Profit and Loss statement, Revolution did not profit from its infringement of Curry's Diesel Test common law trademarks and Curry should be awarded $0 in damages pursuant to §1117(a).

>    **2.    Curry is Not Entitled to Statutory Damages Related to Revolution's Trademark Infringement Under Count III Because Revolution's Use of the Diesel Test Trademark Does Not Constitute Counterfeiting.**

The term "counterfeit mark" is defined as either: (1) a mark that is ***registered*** on the principal register in the United States Patent and Trademark Office's ("USPTO") principal register for use on the same goods and services for which the defendant uses the mark, 15 U.S.C. § 1116(d)(1)(B)(i) or

---

[6] Declaration of Trent Turner, Revolution's accounting manager, is attached to the LR56.2 Statements of Fact.

(2) "a spurious mark which is identical with, or substantially indistinguishable from, a ***registered*** mark." *Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872, 880 (N.D. Ill. 2013) (emphasis added) citing 15 U.S.C. § 1127; 15 U.S.C. § 1116(d)(1)(B)(ii). Accordingly, to receive statutory damages for counterfeiting, the plaintiff must establish that the marks in question are ***registered*** for use on the same goods or services for which the defendant used the marks. *See H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1045 (E.D. Wis. 2018) (emphasis added).

Curry's Complaint does not set forth any action for trademark infringement of any federal trademark registration. (*See* Dkt. 1). It is undisputed that Curry does not have a federal trademark registration for Diesel Test, nor did he have a federal trademark registration for Diesel Test during the period of infringement, 2016-2017. (SMF ¶ 47). While the Complaint mentions federal trademark applications, it is undisputed that none of those applications was actually registered at the time of suit and that Curry had no registered trademarks incorporating "Diesel" at the time he filed his Complaint. (SMF ¶ 47). In fact, the only "Diesel" federal trademark registrations that Curry owns are DIESEL FUEL and DIESEL, which did not register until January 8, **2019** and February 11, **2020**, respectively. (SMF ¶ 47). But again, Revolution stopped selling its Diesel Test Product in October of **2017**. (SMF ¶¶ 29, 30). Therefore, Curry cannot recovery statutory damages for counterfeiting based on any of his now registered marks or his unregistered "Diesel Test" mark.

### 3. Revolution's Infringement Was Not Willful Pursuant to 15 U.S.C. § 1117 Because It Reasonably Relied on the Advice of Counsel.

As stated above, when Curry informed Revolution of the alleged infringement, Revolution contacted its attorney to determine the validity of Curry's claims. (SMF ¶¶ 54, 56). A party who acts in reasonable reliance on the advice of counsel regarding a close question of trademark law generally does not act in bad faith. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 962 (7th Cir. 1992). In treating the issue of willfulness, courts have considered whether the defendant intended to

trade on the plaintiff's mark and whether, once notified to cease and desist, the infringer responded prudently by seeking advice of counsel or, on the other hand, chose to ignore the owner's claim. *Ty, Inc. v. Softbelly's, Inc.*, No. 00 C 5230, 2007 WL 734394, at *2 (N.D. Ill. Mar. 6, 2007), aff'd, 517 F.3d 494 (7th Cir. 2008). On the other hand, fees have been denied even where deliberate copying existed when the defendant was "armed with a well intended letter from trademark counsel stating that there was no infringement." *Id.*, quoting *CFM Majestic, Inc. v. NHC, Inc.*, 93 F.Supp.2d 942, 961 (N.D. Ind. 2000).

Here, upon receiving Curry's cease and desist letter, Revolution promptly contacted its outside counsel, Mr. Santos. (SMF ¶ 54). Revolution and its counsel searched the USPTO records and did not find any registration for "Diesel Test" owned by Curry and conducted further research regarding Curry and Curry's Product. (SMF ¶ 56). The reason they found nothing is because there was nothing to find. To this day, Curry has no federal trademark registration for Diesel Test, and his DIESEL FUEL and DIESEL marks did not register until January 8, **2019** and February 11, **2020**. (SMF ¶ 47). Revolution reasonably relied on the advice of its counsel in connection with it continuing to offer for sale and sell its Diesel Test product. Accordingly, Defendants are entitled to judgment as a matter of law that they are not subject to a finding of willful infringement.

### 4. The Undisputed Evidence Shows Curry Has Not Suffered Damages Under Count I for Violations of the Illinois Consumer Fraud and Deceptive Practices Act.

The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), 815 ILCS 505/1 *et seq.*, is "a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Spiegel v. EngageTel Inc.*, 372 F.Supp.3d 672, 687 (N.D. Ill., 2019). To succeed in showing a violation of the ICFDBPA, a plaintiff must show each of the following 5 prongs: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that **the plaintiff rely** on the

deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) ***actual damage to the plaintiff*** (5) proximately caused by the deception. *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 149 (Ill. 2002) (emphasis added). A plaintiff must allege "actual damages" and the "actual damages must arise from 'purely economic injuries.' " *Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F.Supp.2d 898, 912 (N.D. Ill. 2012). "[D]amages may not be predicated on mere speculation, hypothesis, conjecture or whim." *Petty v. Chrysler Corp.*, 343 Ill.App.3d 815, 823 (1st Dist. 2003), internal citations omitted. "[D]amages are measured by the plaintiff's loss, not the defendant's gain." *Id.*

Here, Curry has never identified any activity of any Defendant that *Curry* relied on in any capacity, thus failing prong 2. Moreover, Curry has no evidence of any actual damage by a deceptive act or practice by Defendants, thus failing prong 4 as well. Indeed, as discussed in Section III(C)(1)(a) *supra*, Curry has not provided any evidence of any lost sales. Accordingly, Defendants are entitled to judgment on Count I of the Complaint.

5. **There is No Triable Issue of Fact on Count V (Common Law Trademark Infringement) Because the Parties Entered into an Injunction.**

Revolution stipulated to liability for common law trademark infringement. (Dkt. 156). Further, the parties entered a stipulated preliminary injunction wherein Defendants are enjoined from, *inter alia*, using in any manner, the Diesel Marks, or any colorable imitation or confusingly similar version of those marks. (Dkt. 132). According to the Complaint, Curry only seeks injunctive relief for Count V for common law trademark infringement; Curry does not seek actual damages or attorneys' fees or costs. (Dkt. 1, ¶¶ 78-80). Curry received the remedy he sought. Accordingly, there is no triable issue of fact on Count V.

**6.     There is No Triable Fact on Count II for Violations of the Uniform Deceptive Trade Practice Act Because the Parties Entered into an Injunction.**

The Uniform Deceptive Trade Practices Act does not provide for an award of damages as a remedy, but it does permit private suits for injunctive relief and has generally been held to apply to situations where one competitor is harmed or may be harmed by unfair trade practices of another. *Greenberg v. United Airlines*, 206 Ill. App. 3d 40, 46 (1st Dist. 1990), appeal denied 156 Ill. Dec. 561, 137 Ill.2d 664, 571 N.E.2d 148. Here, because the parties entered into a stipulated preliminary injunction, there is no triable issue of fact for damages on Count II.

## IV.     CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Motion for Summary Judgment because the undisputed evidence established (1) Barry and Joshua are not personally liable for any of the counts of the Complaint; (2) Curry failed to establish violations of the ACPA, apart from the one domain previously stipulated by Revolution; (3) Curry did not introduce any evidence of damages pursuant to 15 U.S.C. §1117(a); (4) Curry is not entitled to statutory damages pursuant to 15 U.S.C. §1117(c); (5) Revolution's infringement was not willful; and (6) there is no triable fact on damages for Counts II and V.

Dated: June 2, 2021                                Respectfully submitted,

                                                   By: */s/ Christopher W. Niro*
                                                   One of Its Attorneys

Christopher W. Niro (ARDC # 6300428)
cniro@agdglaw.com
Kristina D. Diesner (ARDC #6329611)
kdiesner@agdglaw.com
Amy M. Gibson (ARDC #6293612)
agibson@agdglaw.com
R. Timothy Novel (ARDC #6297303)
tnovel@agdglaw.com
Aronberg Goldgehn Davis & Garmisa
330 N. Wabash Avenue, Suite 1700
Chicago, IL 60611

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing **Defendants' Memorandum in Support of Their Motion for Summary Judgment** was electronically filed with the Clerk of the Court using the CM/ECF system on June 2, 2021, which will send notification of such filing to all counsel of record.


*/s/ Christopher W. Niro*