## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **CHARLES CURRY, d/b/a**<br>**Get Diesel Nutrition,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17 C 2283** |
| | ) | |
| **REVOLUTION LABORATORIES, LLC,** | ) | |
| **REV LABS MANAGEMENT, INC.,** | ) | |
| **JOSHUA NUSSBAUM, and BARRY** | ) | |
| **NUSSBAUM,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Charles Curry sells nutritional supplements bearing the brand "Diesel."  After

discovering that Revolution Laboratories sold an identically labeled product, Curry sent

a cease-and-desist letter and subsequently sued Revolution and company management

for infringing his trademark.  Both parties have moved for summary judgment.  For the

reasons stated below, the Court grants the defendants' motion in part and denies it in

part and denies Curry's motion.

### Background

The following facts are undisputed except where otherwise noted.  Curry is a

Chicago-area small business owner who sells Diesel-branded nutritional supplements

through his company, Get Diesel Nutrition.  He began selling a product branded Diesel

Fuel, his first product, in 2002, and one branded Diesel Test in 2005.  He has spent

thousands of dollars advertising Diesel Test online and in weightlifting publications, such as Planet Muscle Magazine. In June 2016, Curry filed a trademark application for the mark Diesel Fuel claiming a first-use date of June 2002.

Joshua Nussbaum and Barry Nussbaum operate Revolution Laboratories (Revolution), a limited liability company organized under Nevada law with its principal place of business in California. Revolution sells nutritional supplements and apparel. The Court will refer to each of the Nussbaums by his first name for the sake of simplicity. Joshua holds the title of President and manages the day-to-day operations of the company. Barry (Joshua's father) holds the title of CEO; he serves as a "mentor" and is "involved in the decisions of major magnitude." Pl.'s Rule 56.1(b)(2) Resp. to Defs.' Stat. of Material Facts ¶ 17 (dkt. no. 177-1). Joshua and Barry also created Rev Labs Management for the purpose of acting as manager of Revolution. Revolution employed approximately 40 employees from 2016 to 2017 and had a core leadership group of five individuals, two of whom were Joshua and Barry. *Id.* ¶ 4.

Revolution sells its products both directly and through affiliate networks. Revolution's direct sales channels consist of Amazon, eBay, its own website (boostedtestforyou.com), via e-mail, and by phone. The mechanics of how Revolution operates its affiliate networks is a subject of dispute. The defendants point to Galina Polyakova, Revolution's CFO and one of the leadership group members, as responsible for these networks, and they assert that neither Joshua nor Barry is involved. *Id.* ¶ 8. Curry contends that Joshua was "directly involved in discussions about registering and setting up websites" and had "final approval" over marketing affiliate decisions. *Id.* He also contends that Barry was "aware that Revolution was using affiliate marketing . . .

2

and had the authority to manage those efforts." *Id.*

In October 2016, Revolution began marketing and selling a product called Diesel Test. In November 2016, after receiving messages from customers expressing confusion, Curry sent Revolution a cease-and-desist request explaining that he had common law rights to the Diesel Test mark. Upon receiving Curry's message, Joshua forwarded the message to Revolution's leadership team, including Barry, writing:

> Russ can you please do a search and see if 'diesel test' is available for trademark or if this guy is telling the truth. I personally vote we let him sue us to get through the remainder of our labels and then change the name to DZL Test on our next run.

Defs.' Resp. to Pl.'s Rule 56.1(a)(2) Stat. of Material Facts ¶ 34 (dkt. no. 188-6). Further along in that e-mail chain, two Revolution employees discussed that the trademark was not registered and was available for purchase. When one employee asked if the company should purchase the trademark, Barry responded "Yesssssssss." *Id.* ¶ 39. Barry believed that Revolution "had blundered into somebody's [Diesel Test] name," and he agreed with Joshua that they "should ignore Mr. Curry's cease and desist request and let him sue the company." *Id.* ¶ 37.

Later in November 2016, Revolution filed an application with the U.S. Patent and Trademark Office (USPTO) seeking to register the Diesel Test mark. The application listed Joshua as the owner of the mark. In March 2017, the USPTO suspended the defendants' Diesel Test application, explaining that Curry's "earlier filed" application first had to be "registered or abandoned." *Id.* ¶ 43. The USPTO registered Curry's trademark for "Diesel Fuel" in January 2019 and for "Diesel" in February 2020. His application for "Diesel Test" is still pending, and the defendants are opposing that application.

In March 2017, Curry sued Revolution, Rev Labs Management, Joshua Nussbaum, and Barry Nussbaum and asserted seven claims based on the defendants' claimed infringement of his Diesel Test trademark. He has since dropped two of those claims, counts four and seven. Count one of Curry's complaint alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505. Count two alleges a violation of the Illinois Uniform Deceptive Trade Practices Act (IUDTPA), 815 ILCS 510/2. Count three alleges a violation of the Lanham Act, 15 U.S.C. § 1125(a), for false designation of origin and false advertising. Count five alleges common law trademark infringement. Count six alleges a violation of the Anti-Cybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d).

Revolution claims to have ceased all sales of its Diesel Test product by October 2017. Curry disagrees with this date and contends that sales continued into 2020 through alternative affiliate websites: he says that dieseltestbooster-red.com remained active into May 2020 and dieseltest.net remained so into September 2020. The Court granted a stipulated preliminary injunction in August 2020 that enjoined the defendants from marketing or selling any products bearing Curry's mark. Stipulated Prelim. Inj. (dkt. no. 132).

## Discussion

Both parties have moved for summary judgment. The defendants argue that Joshua and Barry cannot be held individually liable for federal and common law trademark infringement; Curry cannot establish a violation of the ACPA; he cannot sustain a claim under the ICFA; and that the preliminary injunction entered by the Court renders moot his request for equitable relief. In his cross-motion, Curry contests these

arguments and additionally contends that he is entitled to summary judgment on his trademark claims, his state law claims, and part of his ACPA claim.

To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When parties file cross-motions for summary judgment, courts "construe all inferences in favor of the party against whom the motion under consideration is made." *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (quoting *Rupcich v. UFCW Int'l Union, Local 881*, 833 F.3d 847, 853 (7th Cir. 2016)). The non-moving party must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).

**A.      Federal law claims**

      **1.      Lanham Act**

            **a.      Individual liability**

In count three of Curry's complaint, he alleges the defendants violated the Lanham Act, 15 U.S.C. § 1125(a). Revolution has stipulated to liability under the Lanham Act for infringing Curry's Diesel Test trademark. Defs.' Resp. to Pl.'s Rule

56.1(a)(2) Stat. of Material Facts ¶ 74 (dkt. no. 188-6). The defendants argue, however, that Joshua and Barry cannot be held individually liable for two reasons: first, because Curry is unable to pierce the corporate veil; and second, because they acted within their roles as officers and thus cannot be held individually liable.

The defendants' corporate veil argument involves a non-issue. Curry has made it clear that he does not premise his claims against Joshua or Barry on a veil-piercing theory, and veil-piercing is not the primary means of holding a corporate officer liable for trademark infringement. *See Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 468 F.2d 225, 233 (7th Cir.1972); *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926).

As to the defendants' second argument, the Seventh Circuit's 1926 *Dangler* decision is still the touchstone for determining whether an officer can be held individually liable for infringement of an intellectual property right and, in particular, for trademark infringement. *See 4SEMO.com Inc. v. S. Ill. Storm Shelters, Inc.*, 939 F.3d 905, 912 (7th Cir. 2019). The court in *Dangler* held that individual liability is permitted "when the officer acts willfully and knowingly," which establishes the "special showing" necessary to overcome the default rule that corporate officers are not individually liable for corporate-related wrongdoing. *Dangler*, 11 F.2d at 947. The court further clarified that the following circumstances suffice to meet this standard:

> [1] when [the officer] personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or [2] when [the officer] uses the corporation as an instrument to carry out his own willful and deliberate infringements, or [3] when [the officer] knowingly uses an irresponsible corporation with the purpose of avoiding personal liability. . . .

*Id.*

6

Curry points to numerous facts suggesting that both Joshua and Barry infringed his trademark willfully and knowingly.  *See* Mem. of Law in Supp. of Pl.'s Cross-Mot. for Summ. J. & in Opp'n to Defs.' Mot. for Summ. J. at 6–10 (dkt. no. 177).  Most notably, the e-mail exchange among Revolution officers following Curry's cease-and-desist letter would permit a finding that both individual defendants learned that Curry owned the Diesel trademark and yet authorized the continued sale of infringing products.[1]  Def's. Resp. to Pl.'s Rule 56.1(a)(2) Stat. of Material Facts ¶¶ 34–39 (dkt. no. 188-6). Interpreting the facts in the light most favorable to Curry as required on defendants' motion, this e-mail exchange establishes a genuine factual dispute sufficient for Curry to survive summary judgment.  The additional evidence that Curry points to, including evidence on Joshua's role in managing and approving online sales, further bolsters this conclusion.

In their reply, the defendants emphasize that none of the evidence suggests that either individual was solely responsible for selling Revolution's Diesel product.  They also interpret *Dangler* as confining liability to situations when officers act beyond the scope of their official duties.  The first of these contentions does not matter, and the second lacks merit.  *Dangler* does not limit individual liability to situations where the officer acts alone, and the defendants do not cite any case supporting this interpretation.  Additionally, Seventh Circuit caselaw indicates that officers can be held liable regardless of whether they act within the scope of their duties.  *See, e.g.*, *Weller*

---

[1] The Court notes that there are two distinct time periods relevant to proving certain aspects of Curry's claims: *before* and *after* Revolution received the first cease-and-desist letter. This is particularly significant in the context of proving Joshua and Barry acted willfully and knowingly.

*Mfg. Co. v. Wen Prods., Inc.*, 231 F.2d 795, 801 (7th Cir. 1956); *Gen. Motors Corp. v. Provus*, 100 F.2d 562, 564 (7th Cir. 1938); *see also Am. Ass'n of Motorcycle Inj. Laws., Inc. v. HP3 L., LLC*, No. 20 C 4866, 2021 WL 3054799, at *4 (N.D. Ill. July 20, 2021). Accordingly, the defendants are not entitled to summary judgment on this claim.

Curry has also moved for summary judgment on the issue of individual liability. He argues that based on *Dangler*'s standard, the facts discussed above are sufficient to hold Joshua and Barry liable. But viewing these facts in the light most favorable to the defendants, a reasonable jury could find that Joshua and Barry did not willfully or knowingly infringe his mark. For example, a factfinder could construe the e-mail exchange as reflecting Joshua and Barry's desire to explore their legal options in the wake of infringement uncertainty. Curry also points to Joshua's attempt to register the Diesel Test mark under his own name as demonstrative of his intent, but that fact is disputed based on the possibility that a different Revolution executive filed the application using Joshua's name. Defs.' Resp. to Pl.'s Rule 56.1(a)(2) Stat. of Material Facts ¶ 40 (dkt. no. 188-6). In a similar vein, there is a material dispute regarding what role Joshua played in managing the Amazon and eBay sales and how hands-on he was in that capacity. *Id.* ¶¶ 13–18. Given these genuine factual disputes, Curry is not entitled to summary judgment.

> **b.    Damages**

Aside from individual liability, the parties also raise various issues related to damages under the Lanham Act. The Lanham Act permits the owner of an infringed mark to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). With regard to recovery of the

defendant's profits, the plaintiff has the burden of proving the defendant's sales, and the defendant must prove any costs or deductions. *Id.*

Both parties contend that they are entitled to summary judgment on the issue of profits under section 1117(a)(1). Though the exact figures slightly differ, the parties largely agree on the amount of Revolution's sales revenues; where they split is on the amount of its costs. The defendants point to Revolution's profit and loss statement and the declaration of the company's accounting manager, Trent Turner, as evidence that the company's costs exceeded its sales revenues. Curry disputes the accuracy of the profit and loss statement based on the opinion of his damages expert, Joel Herman.

Each side takes issue with the other's relevant witness—Turner and Herman. Curry contends that during Turner's deposition under Rule 30(b)(1), he admitted that he had not verified the information underlying the profit and loss statement before creating it. Curry argues based on this that the Court should disregard the statement. He also points to a declaration from Herman to the effect that Revolution's costs are unsubstantiated. The defendants dispute Curry's contention about Turner by pointing to his declaration following his Rule 30(b)(1) deposition, as well as his subsequent Rule 30(b)(6) deposition testimony, in which he asserted that he had reviewed the documents underlying the creation of the profit and loss statement. *See* Decl. of Trent Turner ¶¶ 12–15 (dkt. no. 170-9). The defendants also argue that Herman's declaration should be excluded as an untimely supplemental expert report.

The Court concludes that there are genuine disputes of material fact such that summary judgment on the question of profits recovery is inappropriate for either party. On the defendants' motion, the record is devoid of any documents substantiating the

9

creation of the profit and loss statement, and the defendants do not dispute that they did not provide Curry with any supporting documentation for the statement. *See* Defs.' Resp. to Pl.'s Rule 56.1(a)(2) Stat. of Material Facts ¶ 62 (dkt. no. 188-6). In addition, Curry's reliance on Herman's declaration is permissible because the declaration simply restates his opinion from his expert report, which was timely. *Cf. Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) (explaining that "[a]llowing parties to cure a deficient report with later depositions would further undermine a primary goal of Rule 26(a)(2)"); *see also Rowe Int'l Corp. v. Ecast, Inc.*, 586 F. Supp. 2d 924, 935 (N.D. Ill. 2008) (Kennelly, J.) ("The primary rationale for excluding untimely expert opinions is to avoid an unfair 'ambush' in which a party advances new theories or evidence to which its opponent has insufficient time to formulate a response."). Considering the evidence in the light most favorable to Curry, a reasonable jury could find that Revolution has not proven its costs.

That said, a reasonable jury could also conclude the opposite, in other words that Revolution did not profit from selling the infringing product. Put simply, a jury could believe the accuracy of the profit and loss statement, and if so it could find in Revolution's favor. Thus Curry is not entitled to summary judgment on this point. Turner's original deposition testimony also supports this conclusion. Even if the Court were to disregard Turner's later declaration, during his original deposition, he explained how he created the statement using Quickbooks and Revolution's Diesel Test product data. Dep. of Trent Turner at 166 (dkt. no. 177-14). This testimony is within Turner's personal knowledge and thus is properly considered on summary judgment. *See Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).

Aside from the issue of Revolution's profits, the defendants additionally contend that Curry is not entitled to statutory damages under 15 U.S.C. § 1117(c). Congress authorized statutory damages in cases "involving the use of a counterfeit mark," where the determination of a mark as "counterfeit" hinges on whether it was registered with the USPTO at the time of infringement. 15 U.S.C. § 1116, 1117(c). The defendants contend that they stopped selling their Diesel product prior to Curry registering his marks, meaning their product would not qualify as counterfeit.

The defendants are not entitled to summary judgment on this point because there is a genuine dispute of material fact. Curry registered two of his marks in January 2019 and February 2020. The defendants have admitted that Revolution owned the website dieseltestbooster-red.com; it was active as of May 2020; and the Diesel product may have been sold through that website. Defs.' Resp. to Pl.'s Rule 56.1(a)(2) Stat. of Material Facts ¶¶ 49–50, 74 (dkt. no. 188-6). The defendants did not respond to Curry's argument on this issue in their reply brief, which further underscores that this issue is best suited for trial.

The Court denies both parties' motions for summary judgment on the issues of Lanham Act profits and damages.

## 2. Anti-Cybersquatting Consumer Protection Act

Count six of Curry's complaint alleges the defendants violated the ACPA, 15 U.S.C. § 1125(d). Curry has specified that the domains at issue are only those with Diesel Test in their name. Mem. of Law in Supp. of Pl.'s Cross-Mot. for Summ. J. & in Opp'n to Defs.' Mot. for Summ. J. at 16 n.10 (dkt. no. 177). Like the Lanham Act violation, Revolution has stipulated to liability for violating the ACPA with respect to the

domain dieseltestbooster-red.com.  *Id.* ¶ 74.

To establish an ACPA violation, a plaintiff must prove three elements.  15 U.S.C. § 1125(d)(1).  First, the plaintiff must establish that the mark was "distinctive" or "famous" at the time of domain registration.  *Id.* § 1125(d)(1)(ii).  Second, the plaintiff must show that the defendant "registered, trafficked in, or used" the identical or similar domain.  *Id.*  Third, the plaintiff must show that the defendant had a "bad faith intent" to profit from the domain.  *Id.* § 1125(d)(1)(i).  The defendants argue that Curry cannot establish any of these three elements.

As to the first element, the defendants contend that the Diesel Test mark was not distinctive or famous in 2016.  In response, Curry cites *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992), for the proposition that "[t]rademarks that are suggestive, arbitrary, or fanciful are deemed inherently distinctive and are entitled to protection."  Mem. of Law in Supp. of Pl.'s Cross-Mot. for Summ. J. & in Opp'n to Defs.' Mot. for Summ. J. at 13 n.6 (dkt. no. 177).  Because the defendants do not reply to Curry's argument, the Court considers the point forfeited for purposes of summary judgment.  *See Sansone v. Brennan*, 917 F.3d 975, 983 (7th Cir. 2019) ("Forfeiture occurs when a party fails to make an argument because of accident or neglect.").

On the second element, the defendants argue that their domain activity does not fall within the statutory requirement of "registered, trafficked in, or used."  15 U.S.C. § 1125(d)(1)(ii).  Curry argues that there is a genuine factual dispute because there is evidence the defendants were the de facto registrants of the domains.

The Court concludes that Curry has the better of the argument.  There is ample evidence that affiliate marketers registered the domains on behalf of Revolution.  *See*

12

Defs.' Resp. to Pl.'s Rule 56.1(b)(3) Stat. of Additional Facts ¶¶ 9–15 (dkt. no. 188-7). On this point, visitors of these affiliate domains were purportedly redirected to Revolution's own website to purchase the Diesel Test product. *Id.* ¶ 13. Moreover, one of the allegedly infringing domains, dieseltest.us, listed Revolution's mailing address, phone number, and e-mail address under its "Contact Us" tab. *Id.* ¶ 17. The Court agrees with the holdings of numerous other district courts that ACPA liability can arise when a defendant is the de facto registrant of an infringing domain in that it directed another to register the domain on the defendant's behalf. *See Flentye v. Kathrein*, 485 F. Supp. 2d 903, 914 (N.D. Ill. 2007) (denying motion to dismiss ACPA claim where the defendant was the "alter ego" of the domain registrant); *see also Am. Ass'n for Justice v. The Am. Trial Lawyers Ass'n*, 698 F. Supp. 2d 1129, 1145 (D. Minn. 2010); *Transamerica Corp. v. Moniker Online Servs., LLC*, 672 F. Supp. 2d 1353, 1365–66 (S.D. Fla. 2009).

On the third element, establishing "bad faith intent" requires the factfinder to weigh nine non-exhaustive statutory factors. *See* 15 U.S.C. § 1125(d)(1)(B)(i). For example, one factor is whether the domain was used in connection with the offering of any goods or services. *Id.* § 1125(d)(1)(B)(i)(III). Another factor is whether the domain diverted consumers from the mark owner's online location. *Id.* § 1125(d)(1)(B)(i)(V). Both parties unsurprisingly highlight certain factors that they see as supporting their respective positions. This is a quintessential jury issue. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993) (explaining that "summary judgment in trademark infringement cases must be approached with great caution" when a finding of fact requires weighing multiple factors). Especially when viewed in

13

the light most favorable to Curry, a factfinder could reasonably conclude that the factors he cites weigh in favor of a finding of bad faith. Defendants are not entitled to summary judgment.

The ACPA's bad faith inquiry also includes a safe harbor provision that precludes liability when the alleged infringer "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Id.* § 1125(d)(1)(B)(ii). The defendants argue that even if they might be considered to have acted in bad faith, the safe harbor applies because they contacted counsel upon receiving Revolution's cease-and-desist letter.

This argument runs into two problems. First, although the timeline of events in the record is not entirely clear, the defendants seemingly registered the domains before they sought the advice of legal counsel, which would make that legal advice immaterial for the purposes of applying the safe harbor provision. *See* Pl.'s Rule 56.1(b)(2) Resp. to Defs.' Stat. of Material Facts ¶ 54 (dkt. no. 177-1). Second, the defendants concede that they have no documentation reflecting any advice of counsel or their reliance on it. Defs.' Resp. to Pl.'s Rule 56.1(b)(3) Stat. of Additional Facts ¶ 23 (dkt. no. 188-7). As Curry points out, the defendants' only evidence that they contacted counsel is their own testimony. Without any corroborating evidence of actual advice by an attorney, a reasonable jury could disbelieve the defendants and find that the safe harbor provision does not apply. The defendants therefore have not established that they are entitled to summary judgment on the ACPA claim.

Curry likewise has moved for summary judgment on the ACPA claim, though his motion seeks only to hold Joshua individually liable for the same infringement to which

Revolution has already stipulated. Curry premises his argument on the fact that Joshua purchased and registered dieseltestbooster-red.com and that his name is listed as the primary contact on the domain. *See* Defs.' Resp. to Pl.'s Rule 56.1(a)(2) Stat. of Material Facts ¶¶ 57–59 (dkt. no. 188-6). These facts, however, are disputed and consequently preclude summary judgment. Although third-party records list "Joshua" and "Nussbaum" as the website registrant's first and last name, the login name is "Revolution Laboratories," and the registration e-mail address is from a different Revolution executive. *Id.* ¶ 58. These facts cast sufficient doubt on Joshua's individual involvement to require denial of Curry's motion for summary judgment on this claim.

## B. State law claims

### 1. Illinois Consumer Fraud and Deceptive Business Practices Act

Count one of Curry's complaint is a claim that the defendants violated the ICFA, 815 ILCS 505.[2] "The elements of a claim under the ICFA are: '(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010)). A private party alleging an ICFA violation must also show "actual damage." *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (quoting 815 ILCS 505/10a(a));

---

[2] Neither the complaint nor Curry's summary judgment briefing specifies whether the violation is based on a claim of deceptive practices or one of unfair conduct. The difference is important on the first element of the claim, because "unfair" conduct is interpreted in accordance with the Federal Trade Commission Act. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417, 775 N.E.2d 951, 960 (2002). But this nuance does not matter to the disposition of this claim on summary judgment.

*see also Duarte v. Convergent Outsourcing, Inc.*, No. 17 C 06051, 2018 WL 3427910, at *4–7 (N.D. Ill. July 16, 2018).

The Court denies Curry's motion. He contends that because Revolution has admitted liability for federal infringement, it is also liable under the ICFA because the legal elements are the same. The Court disagrees. As described in the previous paragraph, the legal elements underlying an ICFA claim differ from the elements of a Lanham Act claim. Furthermore, ICFA claims brought by non-consumers like Curry must meet the "consumer nexus test" and must occur "primarily and substantially" in Illinois—requirements that do not have a Lanham Act analog. *See BCBSM, Inc. v. Walgreen Co.*, 512 F. Supp. 3d 837, 856 (N.D. Ill. 2021) (discussing the consumer nexus test); *Mighty v. Safeguard Properties Mgmt., LLC*, No. 16 C 10815, 2018 WL 5619451, at *9 (N.D. Ill. Oct. 30, 2018) (discussing where the conduct must occur). Because Curry has not addressed the elements under the proper legal test, the Court denies his motion.

The defendants argue that they are entitled to summary judgment because Curry cannot prove two essential elements: that they intended for Curry to rely on their deception, and that he has suffered actual damages. Although Curry primarily counters that the federal legal framework should apply, he also contends that the harm to his reputation and loss of customers constitutes actual damages. Pl.'s Reply in Supp. of Cross-Mot. for Summ. J. at 7–8 (dkt. no. 194). Curry, however, has made no attempt to address the defendants' contention that he failed to establish the intended reliance element. As a result, he has forfeited the point. Because Curry fails on this element, the Court takes no view on the actual damages argument, and the defendants are

16

entitled to summary judgment on the ICFA claim.

### 2. Illinois Uniform Deceptive Trade Practices Act

Count two of Curry's complaint is a claim that the defendants violated the IUDTPA, 815 ILCS 510/2. Curry has moved for summary judgment on this claim and premises his motion on the same theory as his ICFA argument—that proving a Lanham Act violation necessarily establishes a violation of the IUDTPA. Like the ICFA, however, the IUDTPA also "require[s] the dispute occur primarily and substantially in Illinois." *BCBSM, Inc.*, 512 F. Supp. 3d at 856. Because Curry has not addressed this element, the Court denies his motion for summary judgment on this claim.

The defendants have also moved for summary judgment on the IUDTPA claim. They argue that there is no triable issue because there is no likelihood of future harm, which is required for a claim under the IUDTPA. *See Aliano v. Louisville Distilling Co.*, 115 F. Supp. 3d 921, 928 (N.D. Ill. 2015). The defendants assert that the preliminary injunction already in place makes clear that will never use Curry's mark, meaning there is no need for future injunctive relief. This makes no sense. A preliminary injunction is just that—preliminary—and thus it ends with the lawsuit. That aside, the defendants have admitted that they continue to oppose Curry's attempt to register his Diesel Test trademark before the USPTO. Pl.'s Rule 56.1(b)(2) Resp. to Defs.' Stat. of Material Facts ¶ 73 (dkt. no. 177-1). Not only would a permanent injunction assist Curry with this pending application, but the defendants' opposition to his application tends to cut against their contention that they do not intend to use the mark in the future. The defendants are not entitled to summary judgment on this claim.

### 3.    Common law trademark

Count five of Curry's complaint alleges that the defendants violated his common law trademark rights.  Both parties have moved for summary judgment on this claim based on the same grounds as their Lanham Act arguments—the defendants contend that there is insufficient evidence to hold them individually liable, whereas Curry contends the opposite.

"The linchpin of both common law and federal statutory trademark infringement claims is whether consumers in the relevant market confuse the alleged infringer's mark with the complainant's mark," meaning the legal elements of the two generally mirror each other in Illinois.  *AHP Subsidiary Holding Co.*, 1 F.3d at 615; *see also KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1012 (N.D. Ill. 2014) (collecting cases). At issue in this claim is not whether the defendants infringed Curry's common law trademark rights, but whether Joshua and Barry can be held individually liable for the liability to which Revolution has already stipulated.  Although the Seventh Circuit decided *Dangler* in 1926, prior to the Lanham Act's passage in 1946, it is not clear whether the standard for corporate officer individual liability is the same under Illinois common law as it is under the Lanham Act.  Neither party has addressed this issue, however.  The uncertainty on this point makes summary judgment inappropriate.

The defendants offer one last argument in support of summary judgment on this claim.  As with their IUDTPA argument, the defendants contend that Curry has already obtained the injunctive relief that he is seeking under the common law such that there is no triable issue.  This argument lacks merit for the same reason as previously discussed.

18

1: 1:17-cv-02283 Document #: 195 Filed: 01/26/22 Page 19 of 19 PageID #:7794

**Conclusion**

For the reasons stated above, the Court grants summary judgment in favor of the defendants on the plaintiff's ICFA claim (count one of Curry's complaint) but otherwise denies their motion [dkt. no. 170]. The Court denies the plaintiff's motion for summary judgment in its entirety [dkt. no. 177]. The case is set for a telephonic status hearing on February 2, 2022 at 9:20 a.m. to set a trial date and discuss the possibility of settlement. The following call-in number will be used: 888-684-8852, access code 746-1053. Counsel should wait for the case to be called before announcing themselves.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: January 26, 2022