# EXHIBIT 2

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   CHARLES CURRY                        )   Docket No. 17 C 2283
     Doing business as                    )
 4   Get Diesel Nutrition,                )
                                          )
 5                    Plaintiff,          )
                                          )   Chicago, Illinois
 6              vs.                       )   February 7, 2023
                                          )   9:15 o'clock a.m.
 7   REVOLUTION LABORATORIES, LLC, et     )
     al.,                                 )
 8                                        )
                      Defendants.         )
 9
              TRANSCRIPT OF PROCEEDINGS - STATUS
10         BEFORE THE HONORABLE MATTHEW F. KENNELLY

11   APPEARANCES:

12
     For the Plaintiff:   OPPENHEIM + ZEBRAK, LLP
13                        BY:  MR. MATTHEW OPPENHEIM
                               MR. NICHOLAS COOPER HAILEY
14                             MR. JEFFREY KANE
                          4530 Wisconsin Avenue, NW, 5th Floor
15                        Washington, DC 20016
                          (202) 480-2174
16

17
     For the Defendants:  ARONBERG GOLDGEHN DAVIS & GARMISA
18                        BY:  MR. MATTHEW L. DE PRETER
                               MR. GARY PHILLIP HOLLANDER
19                             MS. CHIDINMA O. AHUKANNA
                               MS. AMY GIBSON
20                        330 N. Wabash Ave, Suite 1700
                          Chicago, IL 60611
21                        312-755-3161

22

23   Court Reporter:      MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                          Official Court Reporter
24                        219 S. Dearborn Street, Suite 2102
                          Chicago, Illinois  60604
25                        (312) 435-5639
```

```
 1  APPEARANCES CONTINUED:
 2
    For Mr. Novel:        ALAN J. MANDEL, LTD.
 3                        BY:  MR. JOSEPH E. TIGHE
                          7520 Skokie Blvd.
 4                        Skokie, IL 60077
                          (847) 329-8450
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    Defendants Have Not Produced Required Trust Bank Records.
2    There's no records for something called Menehune,
3    M-e-n-e-h-u-n-e, something called LR Nevada Investments,
4    records from 2016 to 2018 on behalf of seven entities owned by
5    the trust, and incomplete records regarding trust checks, and
6    this is similar to the issue that we were talking about on the
7    Central Pacific Bank account which is -- it just gives dates
8    and not the recipients because the hyperlinks haven't been
9    included.  So we're going to start with the last one first.
10            So I'm going to give defense counsel an opportunity
11   to tell me why I shouldn't tell you to do on that one what I
12   just told you to do on Central Pacific Bank which is click on
13   the attachments and produce them.  And the highlight is in
14   produce them.
15            MR. DePRETER:  Yes, your Honor, this is Matthew
16   DePreter.  My understanding is that this incomplete checks,
17   record trust checks is exactly what you just discussed.
18            THE COURT:  Okay.  Stop.
19            Is he right or is he wrong, Mr. Hailey or
20   Mr. DePreter or whoever is dealing with this stuff?
21            MR. HAILEY:  He's right, your Honor.  These are the
22   same accounts.
23            THE COURT:  Then I'm going to scratch out what I
24   called issue No. 5.
25            So let me hear from defense counsel regarding

1  Menehune, LRNI, and these other entities.  I didn't see
2  anything directly in the response that basically specifically
3  responds to it.  That's why I'm asking you to tell me.
4        MR. DePRETER:  Yes, your Honor, Matthew DePreter.
5  Menehune records were produced on Friday.  LRNI -- the
6  transaction records, again, is what we're talking about.  For
7  everything that we could see from now through the past was
8  produced on Friday as part of our supplement, our supplement
9  that included all the other bank records from the last date
10 that we produced up and through January of 2023.
11       The other, 2016 to 2018, our problem there is we
12 relied on online banking.  We were able to go back to 18
13 months as far as we could go back.  The first time we
14 produced, we went back as far as we could go back and produced
15 those.  In this current supplementation of those bank records,
16 we went back as far as we could go so that there would be
17 overlap and the plaintiffs could see that -- the overlap
18 between our prior production and this production.
19       THE COURT:  Okay.  So basically what I'm hearing on
20 that one is that whatever the online banking was would only
21 let you go back a certain amount and you went back as far as
22 you could.
23       MR. DePRETER:  Correct, your Honor.
24       THE COURT:  Okay.  So back to plaintiff's counsel on
25 the Menehune and LR Nevada Investments, have you looked at

1 what got produced on Friday and does that cover those points?
2     MR. HAILEY: Your Honor, we looked at the Menehune
3 and LRNI records they produced for the last 18 months. So
4 those two sets of records are the same issues as the other
5 records we've been discussing. They are missing the check
6 images with recipient information and they don't cover the
7 infringing period of 2016 to 2018.
8     THE COURT: Right. But isn't the real issue
9 financial status now as it relates to these sort of punitive
10 and punitive-esque damages issues?
11     MR. HAILEY: These records do relate to current
12 assets for purposes of punitive damages, but they are also
13 relevant --
14     THE COURT: Why do you care about 2016?
15     MR. HAILEY: Well, because during the period of
16 infringing activity, we need to understand whether infringing
17 profits were moving in and out of the trust during that
18 period, and also we need to look back to identify trust assets
19 because every time we get additional documents from defendant,
20 we see new assets that weren't previously disclosed.
21     THE COURT: Okay. So your first part of your
22 response to that brings up a point that I wanted to address
23 later but now is a good time to deal with it.
24     So what I am told by the defendants is that you have
25 -- I don't remember if it's QuickBooks or whatever it is, you

1  guys have gotten, the plaintiff has gotten records from the
2  entity or entities involved which allow you to see what was
3  coming in and what was going out and ought to allow you to
4  determine whether it specifies particular profits or not.  It
5  ought to allow you to determine profitability of the company
6  at least, and it would allow you to determine where money was
7  going from the company.  Is that not right?
8             MR. HAILEY:  That's not accurate, your Honor.
9             THE COURT:  What's not accurate about it?
10             MR. HAILEY:  The defendants said that they produced
11  the entire QuickBooks database which is not correct.  The
12  Court ordered --
13             THE COURT:  Pause, pause, pause.  Is that the only
14  thing that's not correct about what I said before?  That you
15  don't have the whole database yet?
16             MR. HAILEY:  We don't have the whole database, so
17  we're unable to see all distributions out of the database
18  including distributions --
19             THE COURT:  Is what you got just for a limited period
20  or is it some other type of limitation?
21             MR. HAILEY:  It's limited to the Diesel Test product
22  and doesn't cover broader federal contributions and getting
23  distributions including the type of information we'd see in
24  these trust bank records.
25             THE COURT:  So I -- maybe I misread something.  I

1 guess I had the impression that you had basically gotten, for
2 want of a better word, what I call the entire ledger of the
3 entity or entities. That's not right from what you just told
4 me.
5         MR. HAILEY: That's not right, your Honor.
6         THE COURT: Okay.
7         MR. HAILEY: Yes, it's limited sales data. It was
8 for Diesel Test. And the Court ordered it produced in
9 connection with the Diesel Test profit and loss statement. It
10 didn't relate to this broader financial discovery issue.
11         THE COURT: Okay. So now kind of linking what you
12 just said to what we're talking about now, what you're telling
13 me now is that you don't know where money generally from the
14 company, the defendant company, was going, whether it was
15 going into the trust or whether it was going to Mr. Nussbaum
16 number one or Mr. Nussbaum number two or to somebody else.
17         MR. HAILEY: That's what we would be able to see if
18 we had the 2016 to 2018 trust bank records, yeah.
19         THE COURT: And the period of infringement in the
20 case is what to what?
21         MR. HAILEY: It began in October 2016 and it
22 continued until at least the first quarter of 2018.
23         THE COURT: Okay. All right. So 2016 to 2018,
24 that's the infringement period. Okay. All right.
25         So let me flip back over to defendants' thing. So

1  what I'm being told here is that -- I get what you told me
2  before about what's available online and I know from my own
3  bank account that they only go back to a certain point with
4  that.  Okay.  So what I'm being told, though, is that's not
5  good enough because it doesn't allow them to determine whether
6  money was coming out of the company to the trust or somewhere
7  else during the period of infringement.  And they need to get
8  that they're saying.
9        So if you disagree with what, which I assume you do,
10 tell me why.
11       MR. DePRETER:  Matthew DePreter, your Honor.  I
12 absolutely disagree with what Mr. Hailey has just told you.
13 We produced our QuickBooks file.  The QuickBooks, I had
14 numerous emails and one of them is an exhibit, it goes through
15 the long exchange, repeatedly asking plaintiffs to come and
16 view the QuickBooks file.  We produced the entire database for
17 production and inspection.  We produced the specific
18 information that plaintiffs were asking for in multiple
19 formats.  The plaintiffs demanded a specific type of file,
20 like I think it was a doc QVC file.  I had multiple
21 conversations with Intuit that the version of QuickBooks that
22 we -- that our client has does not provide for that type of
23 export, and so we produced it by inspection and I requested
24 multiple times that plaintiffs schedule a date, we would go
25 there, you can look at anything that you want to on our

1    QuickBooks file, you can make any report, you can search up,
2    down, sideways, print out copies.
3            THE COURT:  You're now doing what lawyers do which is
4    you're saying six times what you already said once and I got
5    it the first time.
6            Okay.
7            MR. DePRETER:  Sorry.
8            THE COURT:  Let me make sure I'm getting it.  So what
9    plaintiff's counsel told me a minute ago was that in terms of
10   what was produced to them, in other words, handed over to
11   them, let's say, and that's in their possession was just the
12   Diesel Test or whatever the lingo is, the Diesel Test
13   material.
14           What I understood you to be telling me just now is
15   that we, the defendants, told the plaintiff, you can come over
16   and look at the entirety of the QuickBooks file, not just
17   limited to Diesel Test but the whole thing and you can run
18   whatever searches and print whatever reports you want, the
19   whole file for the whole company for whatever the period is.
20   Did I hear you right?
21           MR. DePRETER:  That is absolutely correct.
22           THE COURT:  Stop.  Okay.
23           Back to plaintiff's counsel.  So is what he just told
24   me right?
25           MR. HAILEY:  Your Honor --

1  THE COURT: That they offered you to go over and look
2  at the stuff?
3  MR. HAILEY: That discussion was limited to an
4  inspection of the QuickBooks file in connection with the
5  Diesel Test P&L. We never understood there to be an
6  invitation --
7  THE COURT: Okay. So now you do. Now you have a
8  different understanding. Okay?
9  So I'm just going to tell defense counsel, you can --
10 you're going to have that offer open for another week. And on
11 the plaintiff's side, you got a week to go over and have at it
12 and look at the whole QuickBooks file for whatever period it
13 was that was offered before.
14 I am not -- I know there were probably like 50
15 exhibits to this motion. I'm just going to confess right now,
16 I didn't read all of them. I didn't read very many of them.
17 It was just too much to handle, and so I'm not going to get
18 into the details of the correspondence going back and forth
19 because it just depresses me in this case to do that. So
20 that's the deal on that one.
21 And then to me --
22 MR. HAILEY: Your Honor --
23 THE COURT: I'm talking now, so stop.
24 To me, what that means is that once you have --
25 there's the justification for needing the Menehune and the LR

1  Nevada and the other records from 2016 to 2018, is we don't
2  know whether anything was coming out of the company into those
3  entities at that point in time.  Because you are going to have
4  access to the QuickBooks records in their entirety for the
5  company for that period, that moots those particular requests.
6  Those were items that I'm calling 2 through 4.
7           MR. HAILEY:  Your Honor --
8           THE COURT:  What did you want to say?
9           MR. HAILEY:  -- may I?
10          As I understand it, defendants could make their
11 QuickBooks database available to us online, give us online
12 access --
13          THE COURT:  For goodness sake.
14          MR. HAILEY:  -- which would save us the time and
15 expense of traveling to San Diego to view the same information
16 on their computers.
17          THE COURT:  It's in San Diego?
18          MR. HAILEY:  Yes, your Honor.
19          THE COURT:  I didn't realize people were in San
20 Diego.  But the database.  In other words, when you invited
21 them to come over and look at it, were you inviting them to go
22 to San Diego?
23          MR. DePRETER:  Matthew DePreter.  Yes, your Honor,
24 because we've had so many problems with plaintiffs saying that
25 they don't see what we see, we wanted them to have exactly

1  what we have in our office, and our personnel will be there to
2  answer any questions about how the --
3           THE COURT:  So thanks, you've told me enough.
4           On the plaintiff's side, you know what, it's a really
5  nice place and this is a great time of year to go there.  And
6  you got two weeks rather than one.  So that's the offer.  I'm
7  satisfied that that's the offer that was made.  I'm satisfied
8  that that offer is sufficient to cover the points that we're
9  talking about here.  And so you got two more weeks.  Take them
10 up on the offer.  That's enough time for you to -- for
11 somebody to make arrangements to go out to San Diego for a day
12 or two to look at the stuff.  That is the end of that issue.
13          Now, we're on to the next one, and I'm over on page 3
14 of the plaintiff's submission of January the 27th.  The
15 defendants have not produced records of the trust real estate
16 holdings.  And there are three subheadings under that.  And
17 that is responded to on page 3 of the defendants' February 3rd
18 submission saying that they have produced documents in their
19 custody, possession, and control.
20          With regard to Mr. Nussbaum's home, there isn't an
21 appraisal which I will say parenthetically is not surprising
22 because appraisals only happen if somebody is financing,
23 refinancing or selling, and there's no indication that that
24 was going to happen.  And so the non-existence of an appraisal
25 really doesn't -- really doesn't do much for me.

1 trial of Mr. Hollander.

2 THE COURT: Okay. Great. The jury demand thing.
3 Yeah, I know, I haven't decided that, too. That's right. For
4 a second, I couldn't remember what Rule 39 is. Okay. That's
5 the jury versus bench trial. Yeah, I know I have to decide
6 that.

7 So I'm going to set another status date which is kind
8 of going to be my target date to deal with all of that stuff.
9 It's going to be kind of towards the end of March.

10 So before I do that, I'm girding my loins before
11 saying this, is there anything else?

12 MR. HAILEY: Instead of sending a lawyer out to San
13 Diego, could we take an opportunity to send the QuickBooks
14 expert to do just an export of the database to ship to us? It
15 will save the plaintiff what would be thousands of dollars of
16 travel expenses.

17 THE COURT: So this is what I'm going to tell you to
18 do. When I say you, I mean the plaintiffs and the defendants
19 and your counsel. I'm going to direct plaintiffs and
20 defendants and their counsel to negotiate in good faith to try
21 to develop a mechanism for the plaintiff to get the downloaded
22 QuickBooks data so that they do not have to travel to San
23 Diego.

24 MR. DePRETER: This is defendant, your Honor.

25 THE COURT: Get that resolved within the next week.