# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION, ) ) ) Plaintiff, ) ) v. ) ) REVOLUTION LABORATORIES, LLC, ) REV LABS MANAGEMENT, INC., ) JOSHUA NUSSBAUM, and BARRY ) NUSSBAUM, ) ) Defendants. ) | Case No. 1:17-cv-02283<br><br>Judge Matthew F. Kennelly |

**Declaration of Kim Hoffman**

1. I Kim Hoffman, under penalty of perjury and pursuant to 28 U.S. Code § 1746, make the following declaration in the above captioned matter.

2. I am contractor with Repario, a company specializing in digital forensics and electronic discovery that recently acquired my former employer Elijah LLC, which also specialized in those areas and where I served as Director of Operations for approximately 16 years. I have extensive experience with QuickBooks from my tenure in those roles, including exporting QuickBooks databases, performing searches within QuickBooks, and exporting associated reports from QuickBooks.

3. I am over the age of 18, have personal knowledge of the facts stated herein, and if called upon, could and would testify competently to them.

4. On February 15, 2023 I arrived onsite at Revolution Laboratories office at 9:45am per the client's request. I met with the Defendants and briefly discussed what their

1

understanding of the process would be. It was my understanding that the Plaintiff was going to be attempting to create a copy of the QuickBooks database but was also allowed to view whatever they wanted in the company QuickBooks file. I was instructed that Plaintiff's advisor would be onsite for a 10:00 am start time.

5. Plaintiff's advisor arrived at 10:20 am and stated that an export of the company file would be performed. However, the proposed "export" would have resulted in a live and editable copy being provided to Plaintiff's counsel as QuickBooks online allows for 2 methods of exporting the online database: 1) using their export tool to export the database as spreadsheets or 2) copying the database into a new QuickBooks Online container. I advised Defendant and Defendant's counsel as to what the process would be and that this would result in an editable copy being provided to Plaintiff counsel. To ensure data integrity we collectively, with Plaintiff's advisor, devised a protocol to use the "Close Books" tool in the QuickBooks administrator function to set a lock password to ensure that data could not purposely or inadvertently be changed. By agreement, I would hold the administrator login and set the password for the lock so it could not be removed.

6. At approximately 11:25 am Plaintiff's advisor created a new QuickBooks online company for both LuxeFit (named LuxeFit - Copy) and Revolution Laboratories (Rev - Copy). Plaintiff's advisor stated that since these user profiles were created under the current company admin account that Revolution Laboratories was required to use their credit card to create the copies and that there would probably be a trial period where they would not be charged. That turned out to be false. Revolution Labs had their card charged for the first month of the new database (confirmed via AMEX charges a few days later) upon creation of the new databases. Once I confirmed that Revolution's credit

card was, in fact, charged, I insisted the Advisor update the credit card account details in QuickBooks

7. Plaintiff Advisor then looked in the accounting register and stated she was looking for the start date of the business for the purpose of pulling audit logs. However, I note that audit logs do not regenerate with a new company file so this task of viewing audit logs could only be completed from viewing the actual QuickBooks files. Plaintiff's advisor began exporting a series of audit logs. Because QuickBooks has an export limitation of 10,000 lines in Excel, the audit logs had to be broken down and run by individual dates in some cases. The audit logs can be adjusted to exclude certain activities such as log in/log out but the Plaintiff's advisor elected to run all activities which resulted in a lengthy process of pulling audit logs. After a few attempts at the logs the advisor switched gears to begin working on the complete database copy.

8. Plaintiff's advisor navigated to the backup section of QuickBooks Advanced in order to check on what backups were available. The Revolution Labs QuickBooks file had a few backups in the listing that were "quick" backups that had been run automatically by the QuickBooks backup service. There were not any finalized "Complete" backups, just "Quick" which only backs up activity since the last backup and they had all been run automatically and not initiated manually. QuickBooks Advanced includes backups as part of their service, though, since data resides on the QuickBooks servers and Intuit is responsible for holding the data. Thus, the backup service isn't required but is more of a preference. QuickBooks Advanced sets backups to automatically run at intervals and is set up to "set it and forget it" if it is enabled. The Revolution Labs QuickBooks file had this enabled but LuxeFit did not. The advisor set LuxeFit to enable backup and set the

3

backup to do a "full" backup then set Revolution Labs to enable backup as well and selected "complete" (there are 3 options, quick, full, and complete). She then returned to pulling more audit logs from the original company QuickBooks files, creating and saving multiple audit logs to the Downloads folder.

9. Plaintiff's advisor returned to the newly created files and disabled backups on the new company files per standard process to prepare the file to accept the data once the backup completes. The backups started around 11:40am and were still running at 2:30pm.

10. Plaintiff's advisor opened her email account on Revolution's computer using Office 365 and began to email saved audit logs to Plaintiff's counsel. Plaintiff's advisor sent 7 separate emails to Plaintiff's counsel each containing multiple files. Backups were still running as of 4:00pm when Plaintiff's advisor elected to end the day.

11. On February 17, 2023, I arrived onsite at the agreed time of 12:30 pm. The Revolution Labs backup was still incomplete. Plaintiff's advisor called Plaintiff's counsel to discuss options. The LuxeFit backup was shown as being completed. Plaintiff's advisor initiated copying the LuxeFit backup into the new LuxeFit – Copy file, then Plaintiff's Advisor began searching the QuickBooks Apps section to see if there were alternate methods to make a backup, and initiated a chat with QuickBooks support to see if a "Quick" backup could be used to create the new company file to address RevolutionLabs' backup.

12. While waiting for the chat to initiate, Plaintiff's advisor discussed a list of items she had been requested to pull the drilled down audit log activity to send to Plaintiff's counsel. I advised that she was permitted to review and copy whatever she would like to in the QuickBooks database, and that I was simply there as a representative if there were any

4

questions. Mr. Turner was in the room to provide credentials but was otherwise working on his daily tasks.

13. Later, QuickBooks Support requested a screen share to check on the status of the backup and requested Plaintiff's advisor navigate to that screen. Plaintiff's advisor asked support to explain the differences between the different types of backups that QuickBooks Online allows, and she determined that a complete backup is the course of action that she would like to take. Plaintiff's Advisor asked Support to check as to whether the backup timed out, and Support stated that it was still in process. Support recommended downloading the App, however, the app is simply a portal to the data that is hosted on the QuickBooks Online servers, which is standard for SaaS (Software as a Service) platforms, and no actual data is actually downloaded to a local device, the Plaintiff's Advisor elected to download the App. Plaintiff's advisor set the log out to 3 hours, however, this has no effect on the backup as the backup resides on the servers for QuickBooks and all logins/apps simply act as a way to access the data hosted. Support chat disconnected.

14. Plaintiff's advisor moved back to audit logs and used the search function to find transactions and then pulled each audit log from the specified transaction and exported out multiple logs for display. Plaintiff's advisor stated that she prefers to copy and paste into Word but all of the audits were able to be printed to PDF and it was her preference only. I note that Plaintiff'sAdvisor has Office 365 as her email (as witnessed the day before) and therefore she has Word as part of her service and would have Word as part of her online portal. Therefore she could easily use her instance of Word if she wanted to. Despite Plaintiff's Advisor's protest that the laptop was outdated and didn't have the programs she needed, QuickBooks Online does not require Word or Office to operate.

Furthermore, Plaintiff's Advisor did not ask what the age of the device was, and she was operating off of assumption alone. In my interaction with the laptop I found it to be suitable for the intended purpose. The other computer visible to me in the room was the computer coextensively utilized by Mr. Turner while he was performing his job duties. Plaintiff's Advisor attempted to download a free tool of Open Word Doc so she can provide copy and paste screenshots instead of exporting the logs direct from QuickBooks but apparently found it unsatisfactory.

15. Plaintiff's advisor continued to go through audit logs and obtained multiple exports of the same audit logs in different views so Plaintiff's counsel can select which format he preferred. This is again a lengthy process, further complicated by Plaintiff's advisor's insistence to use her own preferences instead of the direct export out of QuickBooks where she simply could print to PDF. Plaintiff's Advisor then began emailing the drilled down audit logs to Mr. Keen at 3:45 PM.

16. Plaintiff's Advisor returned to check on the LuxeFit – Copy to see status of the new company file and found that it had failed. Plaintiff's Advisor realized that she was supposed to turn off automation in the new company file and stated that she did not see that in the instructions. She then went into the file and disabled automations. At this point Plaintiff's advisor realized she had backed LuxeFit up as a full backup and not a complete backup. She then decided to re-backup LuxeFit as a complete backup which delayed the new copy of LuxeFit being provided to Plaintiff's counsel. At 4:00pm Plaintiff's Advisor ended the day.

17. At 9:45am on February 21, 2023 I again arrived on-site. At the time of my arrival, the backup was still running. Plaintiff's Advisor stated to me that she has conferred with

counsel and will continue to pull the audit logs while working on creating the LuxeFit company copy as the re-backed up complete file has finished. Plaintiff's Advisor noted that she had devised a plan to pull reports in lieu of a copy of the Revolution Labs backup if it is not completed in time. Plaintiff's Advisor updated the credit cards on the new company files per request so they do not continue to be billed to the Defendant credit card.

18. Plaintiff's Advisor initiated a chat with support at QuickBooks. Plaintiff's Advisor asked if the backup was still running and QuickBooks support stated that it was. Plaintiff's Advisor did not ask QuickBooks support about any alternative arrangements, but rather just a status of the backup. QuickBooks support chat disconnected and Plaintiff's Advisor returned to the LuxeFit backup. Plaintiff's Advisor prepared it for the new file and initiated a copy to new file.

19. Plaintiff's Advisor then began reviewing attachments in the Revolution Labs QuickBooks file and stated that the purpose was to determine expenses. Plaintiff's Advisor began exporting data from her list from counsel to PDF and saving to a downloads folder. Plaintiff's Advisor began exporting more audit logs to PDF and saving them into the same folder. Revolution Labs QuickBooks file continued to backup and the LuxeFit - Copy continued to be created. At 12:24 pm we took a break for lunch and Plaintiff's Advisor stated that she had another appointment and would return at 2:30.

20. We reconvened at 2:45 pm and discussed schedules and database access. Plaintiff's Advisor stated that she might not be staying to complete the audit logs but would do them if we had to return onsite. She then called Plaintiff's counsel and came back to say she had a few more audit logs to pull and email from the LuxeFit original QuickBooks

database. She began pulling logs and sending screenshots. Plaintiff's Advisor exported all attachments out of the LuxeFit database, there were 150 in total. Plaintiff's Advisor then emailed the documents to Plaintiff counsel and left at 3:46 pm. I forensically collected the downloads folder to ensure that there would be a forensically sound set of data that had been exported from QuickBooks by Plaintiff's Advisor and concluded my day at 3:50 pm.

21. We were scheduled to reconvene at 10:30 am on February 23, 2023. On that date I arrived at 10:20 am. Plaintiff's Advisor arrived at 10:50 am. Plaintiff's Advisor left the room and called Mr. Keen at 10:55 am to report that the Revolution Labs backup was still running. At 11:02 am Plaintiff's Advisor initiated another chat with QuickBooks Support to check on status of backup. Plaintiff's Advisor then checked on the new LuxeFit – Copy and verified that the data was pulled in. Plaintiff's Advisor then disconnected the chat with QuickBooks and then began a new chat with QuickBooks. QuickBooks support confirmed that the Revolution Labs backup was still in progress. Plaintiff's Advisor did not ask QuickBooks about any alternative arrangements, but rather limited the chat to the status of the backup.

22. At that point, I was set as the administrator on the LuxeFit – Copy. I set the lock and the password at that time, and I then sent invites for standard users to the agreed upon list provided by Plaintiff's Advisor. At 12:30pm the day concluded.

23. On March 7, at 10:28 am Plaintiff's Advisor sent a calendar invite to Microsoft Teams for a 10:45 am meeting. It was my understanding that the meeting was for the purpose of conducting a screen share to check on status. While it was Plaintiff's Advisor's choice to proceed in that manner, in my experience, an online chat is not the only method of

reaching QuickBooks support. There are alternatives such as phone or an appointment set for a support person to contact you but Plaintiff's Advisor insisted on the chat method. In my experience a person seeking support only needs the company ID, the phone number on file, and the email address on file to be able to speak to support about a company file.

24. The remainder of my interaction with Plaintiff's Advisor as it relates to the Microsoft Teams meeting is set forth in my prior declaration, which I understand was submitted to this Court as Dkt. 350-40, and which I incorporate herein by this reference. Additionally, I note that Plaintiff's Advisor has represented that she requested Mr. Turner to provide his log in credentials to me during the Teams meeting. I disagree. That request was not made of me or Mr. Turner.

25. The foregoing is true and correct to the best of my knowledge and belief.

Date: 03/28/2023

Signature: _____

Kim Hoffman

4883-1916-1690, v. 1