**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES CURRY, d/b/a Get Diesel Nutrition,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 17 C 2283** |
| **REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Charles Curry sued Revolution Laboratories, LLC, Rev Labs Management, Inc., Joshua Nussbaum, and Barry Nussbaum, alleging that they infringed his trademark and violated the Illinois Consumer Fraud and Deceptive Practices Act (ICFA), the Illinois Uniform Deceptive Trade Practices Act (IUDTPA), and the Anti-Cybersquatting Consumer Protection Act (ACPA). The parties stipulated that Revolution is liable for infringing Curry's Diesel Test mark and violating ACPA with respect to one domain name. The Court granted summary judgment in favor of the defendants on Curry's ICFA claim. The remaining claims proceeded to a jury trial in May 2022, except for the IUDTPA claim, which the parties agreed before trial would be decided by the Court.

The jury found that Joshua and Barry Nussbaum are individually liable for trademark infringement. The jury also found that each defendant's infringement was

willful.  The jury awarded Curry actual damages and defendants' profits and assessed punitive damages against each of the defendants.

Both sides have filed motions regarding the judgment.  The defendants have moved under Federal Rule of Civil Procedure 59(e) to alter the judgment by striking the punitive damages and reducing the award of profits.  Curry has moved under Rule 59(e) to amend the judgment to include pre- and post-judgment interest and for entry of a permanent injunction.  Curry has also moved to find the defendants liable on his IUDTPA claim.  Lastly, Curry has moved for a ruling that the jury's award of defendants' profits should be considered as advisory and that the Court should determine the amount of defendants' profits itself.

For the reasons below, the Court (1) denies the defendants' motion to alter the judgment; (2) grants in part Curry's motions for pre- and post-judgment interest and entry of a permanent injunction; (3) finds the defendants liable for violating IUDTPA; and (4) grants Curry's motion to consider the jury's award of defendants' profits advisory and awards $547,095.44 in defendants' profits.

## Background

The Court assumes familiarity with this case's factual and procedural background, which this Court has discussed in prior written opinions.  *See, e.g.*, *Curry v. Revolution Lab'ys, LLC*, No. 17 C 2283, 2022 WL 225877 (N.D. Ill. Jan. 26, 2022).  The following background is relevant to the post-trial motions and largely is taken from the Court's summary judgment decision and the trial record.

**A.**    **The parties**

Curry resides in Chicago and sells nutritional supplements through his business,

2

Get Diesel Nutrition.  He began selling Diesel Test branded products in 2005.  He has spent thousands of dollars advertising Diesel Test online and in weightlifting publications, such as Planet Muscle Magazine.  He filed a trademark application for the mark Diesel Test in December 2016.

Revolution Laboratories is a limited liability company that sells nutritional supplements and apparel.  Joshua Nussbaum is the President of Revolution, and his father, Barry Nussbaum, is the CEO.  (For the sake of clarity, the Court will refer to each of the Nussbaums by his first name.)  Revolution sells its products directly and through affiliate networks.  In October 2016, Revolution began marketing and selling a product called Diesel Test.  The following month, Curry sent Revolution a cease-and-desist request stating that he had common law rights to the Diesel Test mark.

## B.    Trial testimony

Because the parties stipulated that Revolution was liable for infringement, the trial focused on whether Joshua or Barry are individually liable, whether any defendants had willfully infringed, and damages.[1]  At trial, Curry, Joshua, and Barry testified, along with Curry's damages expert and various Revolution employees.

Both Curry and Joshua testified regarding how they came up with the name Diesel Test.  Curry testified that "Diesel" came from his nickname "Chuck Diesel," which he said came from his past work with diesel fuel.  His first product was called Diesel Fuel, and then he began using the name Get Diesel Nutrition for his business.  He testified that he chose the name Diesel Test for his testosterone boosting product

---

[1] The trial also concerned Curry's ACPA claims, but because neither party has raised any issues with the jury's verdict on that claim, the Court will not discuss that aspect of the trial.

because he wanted to continue using the name Diesel. As noted above, he began selling Diesel Test in 2005. In 2015 and 2016, Diesel Test received Planet Muscle magazine's Best of the Best award.

Regarding Revolution's use of Diesel Test, Joshua testified that it was his decision to use the Diesel Test name and that he was involved in creating the product label. He explained that "Diesel" was a common slang word in the body building community. Barry testified that he did not like the name at first and repeatedly rejected it but that he eventually acquiesced due to Joshua's enthusiasm for the name. Joshua testified that he performed a search for the name on Google and on a website called Trademarks 411, though he did not have any records of performing this search. Joshua explained that because he did not see the Diesel Test mark on the trademark website he searched, he thought "it was fair game." Tr. Vol. 2 at 474:5–11. As noted above, Revolution began selling its Diesel Test product in October 2016. In closing argument, Curry's counsel contended that Revolution and Curry's Diesel Test labels, including the name, color, and font, were too similar for it to be plausible that Joshua independently created it.

Joshua and Barry both testified that they control Revolution. Joshua testified that he managed the company on a day-to-day basis and that he asked Barry for advice regarding Diesel Test. He explained that when Revolution began selling Diesel Test, the company took another product called Rev Test and relabeled it as Diesel Test. He testified that from October 2016 to June 2017, Revolution sold its Diesel Test product to 767 customers in Illinois.

Curry sent three cease-and-desist requests to Revolution in November 2016. In

4

these requests, he included links to his website where he was selling his Diesel Test products.  Joshua testified that he did not reply to these requests nor click the links because he thought it was a scam.  He forwarded Curry's cease-and-desist email to Barry and a couple of other Revolution employees.  In Joshua's email, he asked a Revolution employee to "do a search and see if Diesel Test is available for trademark or if this guy is telling the truth."  Dkt. no. 399-3 at 65:2–7.  In the same email, Joshua wrote:  "I personally vote we let him sue us to get through the remainder of our labels and then change the name to DZL Test on our next run."  *Id.* at 65:19–21.

Barry testified that he agreed with this decision.  He testified that after receiving Curry's cease-and-desist letter, a Revolution employee discovered that the trademark was available for purchase.  Another Revolution employee asked in the same email chain if Revolution should purchase the mark, to which Barry responded: "Yesssssssssss."  Dkt. no. 399-10 at 6.  Joshua then prepared and filed an application to register the Diesel Test trademark under his own name.  That application was later denied by the U.S. Patent and Trademark Office.

Joshua testified that after he received Curry's cease-and-desist request, he searched again on Google and Trademarks 411 for the Diesel Test mark and did not find anything.  He also stated that he spoke with two of his distributors, and they told him that they had not heard of Diesel Test or Curry's company.  At trial, however, Joshua was confronted with evidence that one of those distributors was advertised as Curry's exclusive distributor of Diesel Test.  Barry testified that he searched on Amazon to investigate Curry's claim, but he conceded that he searched for products with the name testosterone in it, not Diesel Test specifically.  Barry also testified that he

instructed Revolution employees to perform searches. He explained that because he did not find evidence of sales or a registered trademark in his searches, he thought Curry's claim was scam.

In February 2017, Amazon banned Revolution's Diesel Test product due to Curry's complaint that it was counterfeit. Joshua and Barry testified that Revolution decided not to contest the Amazon ban because their Diesel Test sales on Amazon were not significant enough. Revolution sales manager Adam Knippel testified via deposition that Revolution continued selling Diesel Test on other channels after Amazon banned the product.

There was conflicting evidence at trial regarding when Revolution stopped selling Diesel Test. Knippel testified that Revolution continued to sell Diesel Test after Curry filed suit in March 2017. Revolution warehouse manager Donna Godwin, who also testified via deposition, explained that as of August 2018, Revolution still had Diesel Test product. Curry testified that in May 2020, he saw a website advertising Revolution's Diesel Test. Joshua testified, however, that Revolution had stopped selling or advertising Diesel Test in October 2017 because it began selling and advertising the product under a new name, RT 2.0. But he also admitted that he had previously submitted an affidavit in this case stating that Revolution did not stop selling Diesel Test products until the first quarter of 2018. *See* dkt. no. 88-1 at ¶ 3. Barry testified that there were a small number of deliveries in 2018 but that Revolution had stopped marketing Diesel Test in 2017.

There was also testimony at trial regarding Revolution's products that it marketed and sold with Diesel Test. Both Joshua and Knippel testified that Diesel Test and MRX

were marketed together as complimentary products. Knippel testified that Revolution's sales team marketed Diesel Test and MRX as a two-step system. Joshua similarly testified that MRX and Rev Test had been advertised as a two-step system. He explained that this was a sales strategy to sell another product after a consumer purchased MRX, and he stated that each step was recorded as an independent sale. Knippel testified that some customers complained that when they purchased Diesel Test online, they were automatically charged for MRX and did not have the option to remove it from their order. He also stated that Revolution sometimes sold Diesel Test in a bundle called Champion Stack with other Revolution products.

Finally, Revolution's accounting manager, Trent Turner, and Curry's expert, Joel Herman, testified regarding damages. Turner testified that Revolution used QuickBooks, an accounting software, to produce a profit-and-loss (P&L) report for Diesel Test. The P&L report covered the period from August 1, 2016 to October 20, 2017. It reflected that Revolution made $1,580,000 in sales after chargebacks and refunds, although Turner testified that this figure did not include sales made on Amazon or eBay. The report showed that after deducting expenses, Revolution experienced a $45,723 loss on Diesel Test during the period covered by the report.

Herman, a certified public accountant, testified that Revolution made at least $2,052,225 in net sales from Diesel Test and $2,131,669 in sales from related products. He testified that ninety-six percent of customers who purchased MRX also purchased Diesel Test at the same time or previously. Herman also testified about Revolution's expenses. For Revolution's related products, he testified that he was not provided any records of expenses. For Diesel Test, he stated that he did receive some documents,

7

but he concluded that he did not receive enough information to verify the expenses shown on Revolution's P&L report. He explained that to conclude that the expenses were reported accurately, he would need supporting documentation for the expenses, such as receipts, leases, invoices, etc., which he was not provided.

There was also evidence introduced at trial regarding the Nussbaum Family Trust. Barry testified that he formed the trust in 2012, and Joshua testified that he is a beneficiary of the trust. Both Barry and Herman testified that the assets held by the trust are currently worth around $38 million. Barry testified that the funding for Revolution came entirely from the trust. He also testified that the trust owns the multimillion-dollar home in Maui where he resides and that the trust pays him consulting fees. Herman testified that the trust made payments into Joshua and Barry's personal accounts and also paid some of Barry's personal expenses. He did not render an opinion, however, regarding whether the assets held by the trust belonged to Joshua and/or Barry. Joshua testified that his net worth was $172,572 in March 2022 and likely lessened since then. Barry testified that his net worth in March 2022 was $23,780 (this, obviously, does not include the assets in the trust).

During closing argument, Curry asked the jury to award $4,183,894 in defendants' profits and $4,183,894 in reputational and loss of goodwill damages. Curry also asked for punitive damages in the amount of the requested trademark damages, *i.e.*, $8.36 million.

## C.    Procedural history and jury instructions

Before trial, the defendants moved to strike Curry's jury demand, contending that Curry was not entitled to a jury on any of his claims. The Court denied this motion,

explaining that Curry's request for actual damages on his trademark claims and punitive damages on his common law trademark claim entitled him to a jury trial.  Given this ruling, the Court declined to "directly address at this point [Curry]'s contention" that he was entitled to a jury trial on his request for the disgorgement of defendants' profits.  Dkt. no. 389-1 at 7:16–25.  The Court held that "[t]he jury will in this case be given the question of determining the recoverability and the amount of defendants' profits, and if I conclude that there's no right to a jury trial for that remedy, the jury will effectively be acting as an advisory jury on the particular point of the amount of the profits." *Id.* at 8:1–6.

Several aspects of the jury instructions are also relevant to the parties' motions.

### 1.    Common law trademark rights

Before trial, Curry filed a motion *in limine* seeking to preclude the defendants from controverting their stipulation that Revolution is liable for infringement.  In response, the defendants contended that Curry "bears the burden of establishing where its trademark rights exist."  Dkt. no. 296 at 7.  They argued that Curry is entitled to trademark protection only in the geographic areas where he has established rights, which they contended was a "question of fact" that depended in part on the volume of Curry's sales.  *Id.* at 4.  The Court granted Curry's motion *in limine*, explaining that the defendants' stipulation regarding Revolution's liability "necessarily includes" an admission that Curry has "enforceable trademark rights" because "a trademark holder who has an invalid or unenforceable mark can't establish liability."  Dkt. no. 362 at 5.

During the trial, the morning after the instruction conference, the defendants stated that they "think an instruction on what constitutes a common law trademark and

geographic scope should have been provided."  Dkt. no. 385-1 at 1095:3–5.  The defendants did not propose an instruction regarding either a common law trademark or geographic scope at the instruction conference.  The Court responded that "the geographic scope thing I ruled on I think in a pretrial motion."  *Id.* at 1095:6–7.

### 2.     Personal liability

The jury instruction regarding personal liability of the Nussbaums is also relevant to the current motions.  In moving for summary judgment, the defendants argued that to be personally liable, the Nussbaums had to have acted beyond the scope of their duties as officers of Revolution.  The Court rejected this contention, holding that "Seventh Circuit caselaw indicates that officers can be held liable regardless of whether they act within the scope of their duties."  *Curry*, 2022 WL 225877, at *4.  At trial, the Court instructed the jury that "[t]o succeed on his trademark infringement claims against the particular individual defendant you are considering, Mr. Curry must prove by a preponderance of the evidence that the defendant personally participated in or directed Revolution's infringing activity."  Dkt. no. 399-9 at 13:12–16.

During the jury's deliberations, the jury asked:  "If a leader is participating in or directing activities in the best interests of the company, on behalf of the company, when is it not considered performed for personal reasons under the law?  All actions are performed by a person."  Dkt. no. 374 at 1.  The Court requested the parties' input on how to respond.  The defendants reasserted their argument at summary judgment that to be personally liable, they must act outside the scope of their employment as officers. The Court declined to give this answer to the jury, noting that the defendants' comment did not help the jury understand their instruction, but rather took issue with the

instruction itself.  The Court instead provided the following answer to the jury, over the defendants' objection:  "As the instruction states, it focuses on whether Mr. Curry has proven that the defendant himself participated in or directed the infringing activity.  It does not require Mr. Curry to prove that the defendant acted for personal reasons or that the defendant did not act in the best interests of Revolution."  *Id.* at 2.

### 3.    The Nussbaum Family Trust

During the instruction conference, Curry proposed the following instruction about the Nussbaum Family Trust:

> During the trial, you heard testimony and saw documents concerning the Nussbaum Family Trust which I will refer to as simply the trust.  You may consider the trust to be an asset of Joshua Nussbaum because Joshua Nussbaum is a beneficiary of the trust.  You may consider the trust to be an asset of Barry Nussbaum if you find any of the following to be true: that the trust has provided benefits to Barry Nussbaum; that Barry Nussbaum exercised authority over assets of the trust; that Barry Nussbaum created the trust in an attempt to shield assets from existing or future creditors; that profits from Revolution's infringement were paid to the trust.

Tr. Vol. 4 at 1071:16–1072:1.  The defendants opposed the instruction, arguing that it would break the trust to allow the jury to consider the trust's assets as Joshua and Barry's assets.  They did not propose an alternative instruction regarding the circumstances under which the jury could consider the trust.  The Court declined to give Curry's proposed instruction because it related to just one factor for the jury to consider when awarding punitive damages.  The Court noted, however, that the jury could decide to consider the trust when considering the defendants' financial condition.

Curry then proposed a simpler instruction on the trust as part of the punitive damages instruction.  The Court adopted this proposal with minor modifications and instructed the jury that "[w]hether and the extent to which you consider the Nussbaum

11

Family Trust in assessing each defendants' financial condition are matters for you to decide." Dkt. no. 399-9 at 22:12–14. The defendants objected, arguing that the instruction would prejudice them by calling the jury's attention to the trust. In their written objection, the defendants stated that the instruction was not necessary because "[b]oth sides may make whatever arguments they want in closing in an effort to persuade the jury how they should consider the Trust and for what purpose." Dkt. no. 373 at 2. (The Court notes that this is essentially what the instruction told the jury.)

The Court overruled the defendants' objection, noting that the defendants did not challenge the correctness of the instruction, but rather the fact that the instruction draws attention to the trust. The Court reasoned that a significant amount of evidence admitted at trial related to the trust, and thus it was appropriate to tell the jury in a neutral way that they must decide whether to consider the trust. The Court also noted that the jury instructions in other spots likewise made specific references to particular types of evidence.

### 4. Defendants' profits

Finally, regarding defendants' profits, the Court instructed the jury that:

> Mr. Curry is required only to prove the defendants' gross revenue, by a preponderance of the evidence. The defendant is required to prove by a preponderance of the evidence any expenses that it argues should be deducted in determining its profits. Mr. Curry is entitled to recover the defendants' total profits from its use of the trademark, unless the defendant proves by a preponderance of the evidence that a portion of the profit is due to other factors.

Dkt. no. 399-9 at 19:13–21. Neither party objected to this instruction. The Court further instructed the jury that "[i]f Mr. Curry proves by a preponderance of the evidence that the defendants profited from their infringement by the sale of other products that were

marketed, sold, or shipped with their Diesel Test product, then he's entitled to recover the defendants' profits from those sales." *Id.* at 20:4–10.

During the jury's deliberations, the jury asked the Court: "If we believe there are other significant factors driving sales / profitability, can we conclude there are profits to be awarded or does that mean we should not determine profits because we can't conclude they are due to the benefit of the infringed trade name?" Dkt. no. 374 at 3. The Court again sought the parties' input regarding the proper response. After discussion, the Court formed a response to the jury that restated the burdens of proof from the original instruction and clarified that "[i]f the defendants prove that a portion of the profit is due to other factors, you should deduct that amount from the total profits in making any monetary award." *Id.* at 4. The Court overruled both sides' objections to the precise wording of this sentence; neither side objected to its substance.

Curry proposed to add to this response that "[t]here may be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark." Dkt. no. 389-8 at 19:6–11. The Court overruled this proposal, explaining that jurors are not typically told the policy reasons behind instructions.

After deliberating, as stated above, the jury found Joshua and Barry individually liable for trademark infringement and found that all three defendants' infringement was willful. The jury awarded Curry $2,500 in actual damages, namely, loss of goodwill and reputational damages, and $500,000 in defendants' profits. The jury also assessed

$300,000 in punitive damages against each defendant.[2]

## Discussion

### A.    Curry's motion for the Court to determine infringing profits

Curry moves under Rule 59(e) for the Court to treat the jury's determination of defendants' profits as advisory under Rule 39(c) and determine the proper award of profits itself.[3]  In the alternative, Curry moves for an enhancement of the jury's award. The defendants' Rule 59(e) motion to reduce the defendants' profits award is also relevant to this issue.  The Court begins its discussion with Curry's motion, noting where it also considers the defendants' contentions raised in their Rule 59(e) motion.

### 1.    Right to determination by a jury

Curry contends that the Court should treat the jury's disgorged profits award as advisory because disgorgement is an equitable remedy.  As a preliminary matter, the defendants argue that because Curry previously contended in his response to their motion to strike his jury demand that he was entitled to a jury trial on this point, he should be barred under the doctrine of judicial estoppel from now contradicting that contention.

Judicial estoppel "prevents litigants from manipulating the judicial system by

---

[2] As noted above, the jury also made findings and awarded damages on Curry's ACPA claim, which is not at issue on the present motions.

[3] The defendants argue in a footnote that Curry's brief should be stricken because it exceeds the proper page limit.  The Court notes that the text of the brief itself (Dkt. no. 399) was within the fifteen-page limit; only the signature line carried over to the next page.  For this reason, the defendants' argument is, quite honestly, rather ridiculous. That aside, as both sides have at times engaged in this practice throughout this litigation, the Court declines this request.  *See Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) ("[I]t is clear that the decision whether to apply [local rules] strictly or to overlook any transgression is one left to the district court's discretion.") (internal quotation marks omitted).

prevailing in different cases or phases of a case by adopting inconsistent positions." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 547 (7th Cir. 2014). To invoke judicial estoppel, the invoking party typically must show: (1) the earlier and the later positions are inconsistent; (2) the party prevailed in the earlier proceeding based on the court's acceptance of the earlier position; and (3) allowing the party to assert an inconsistent position would provide it with an unfair advantage if not estopped. *See In re Knight-Celotex, LLC*, 695 F.3d 714, 721–22 (7th Cir. 2012).

Judicial estoppel does not apply in this case because the defendants have not shown the second element. That element requires that "the party must have prevailed on the basis of its earlier position so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 914 (7th Cir. 2005) (internal quotation marks omitted). Curry did not prevail on his previous contention that he was entitled to a jury trial on disgorgement. Rather, the Court held that Curry was entitled to a jury trial based on his other claims and expressly reserved ruling on the disgorgement point until after trial. The Court specifically noted that although the jury would be asked to determine the amount of defendants' profits, that award could be treated as advisory depending on the Court's ultimate conclusion. Moreover, by expressly reserving the issue, the Court was in no way misled by Curry's prior position. Thus, judicial estoppel does not bar Curry's contention that the jury's disgorgement award should be treated as advisory. *See Kelly v. Herrell*, No. 21-2442, 2022 WL 17851675, at *4 (7th Cir. Dec. 22, 2022) (affirming the denial of a motion for judicial estoppel where the party "did not prevail" on its earlier position, "which is a

necessary condition of judicial estoppel").

The Court therefore proceeds to consider whether the jury's disgorgement award should be treated as advisory.  As the Court noted when ruling on the defendants' motion to strike Curry's jury demand, it has held in two other cases that "a request for disgorgement of profits in a Lanham Act case involves equitable relief on which plaintiff is not entitled to a jury trial."  *Chicago Mercantile Exch. Inc. v. Ice Clear US, Inc.*, No. 18 C 1376, 2020 WL 5370625, at *1 (N.D. Ill. Aug. 10, 2020); *see also Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, No. 15 C 3717, 2017 WL 1049464, at *2 (N.D. Ill. Mar. 20, 2017) ("[T]he request for disgorgement of profits in a Lanham Act case is a claim for equitable relief that did not entitle Ariel Capital to a jury trial.").  The Court adheres to its decisions in those cases.

Both the Supreme Court and the Seventh Circuit have characterized disgorgement as an equitable remedy.  *See Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 570 (1990) ("[W]e have characterized damages as equitable where they are restitutionary, such as in actions for disgorgement of improper profits.") (alteration accepted) (citation and internal quotation marks omitted); *Fuller Prod. Co. v. Fuller Brush Co.*, 299 F.2d 772, 777 (7th Cir. 1962) ("An accounting for profits, however, is an equitable remedy subject to the principles of equity."); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1095 (7th Cir. 1994) (labeling disgorgement of defendants' profits as an equitable remedy).  The three circuits that have squarely addressed this issue have concluded that "[a] claim for disgorgement of profits under § 1117(a) is equitable, not legal" and therefore does not create a jury right.  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015); *see also Hard*

*Candy, LLC v. Anastasia Beverly Hills*, *Inc.*, 921 F.3d 1343, 1358 (11th Cir. 2019) ("[A] claim for an accounting and disgorgement of profits under the Lanham Act is equitable in nature and, therefore, [ ] the Seventh Amendment's guarantee of a jury trial does not apply."); *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1248 (6th Cir. 1991) (holding that the defendant was not entitled to a jury trial where the plaintiff's complaint "requested only equitable relief; an injunction and disgorgement of profits").

In Curry's response to the defendants' earlier motion to strike his jury demand, he contended that he was entitled to a jury trial on this remedy because he was seeking infringing profits as a proxy for his damages. The Eleventh Circuit rejected this argument in *Hard Candy*, noting that to adopt this proposition "would make the Seventh Amendment right fully depend on the rationale the plaintiff offered for seeking to recover the defendant's profits," which "is inconsistent with the longstanding interpretation of the Seventh Amendment set out by the Supreme Court." *Hard Candy*, 921 F.3d at 1352, 1360. Curry also argued that this request for relief was intertwined with his other claims and required credibility determinations, but he did not cite any authority for the proposition that this would entitle him to a jury trial on this claim. And, in any event, the defendants do not assert any of these arguments in contesting Curry's current motion.

In sum, the Court concludes that there is no right to a jury trial for Curry's requested remedy of defendants' profits. The jury's award of $500,000 in defendants' profits is therefore advisory under Rule 39(c)(1).

## 2. Calculation of defendants' profits

Because the jury's award is advisory, the Court must determine the appropriate amount of defendants' profits to award under section 1117(a) of the Lanham Act. *See*

Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts . . . with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").[4]

To recover the defendants' profits under the Lanham Act, Curry's only burden is to prove the defendants' sales. *See* 15 U.S.C. § 1117(a). The burden then shifts to the defendants to "prove all elements of cost or deduction claimed." *Id.* "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *Id.*

First, the defendants contend in their Rule 59(e) motion that under *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992), the Court should award profits by using a reasonable royalty. But the Seventh Circuit's holding in *Sands* that the district court must use a reasonable royalty as a "starting point" for damages was unique to the facts of that case. *Id.* at 963 n.19. In *Sands*, the defendant ran an infringing advertising campaign without intending to trade on the plaintiff's goodwill or reputation, and the plaintiff had previously licensed its mark to a third party. *Id.* at 950, 961–963. Given these circumstances, the Seventh Circuit held that "[a] reasonable royalty, perhaps related in some way to the fee [the plaintiff] was paid by [the previous licensee], would more accurately reflect both the extent of [the defendant]'s unjust enrichment and the interest of [the plaintiff] that ha[d] been infringed." *Id.* at 963.

These circumstances are absent from this case. First, there is no evidence that Curry has previously licensed his trademark. The Seventh Circuit subsequently

---

[4] Because the Court grants Curry's motion to treat the jury's award as advisory and determines the proper amount of profits itself, it need not address Curry's contention that the jury was given an incomplete instruction on apportionment.

18

emphasized in *Sands* that a reasonable royalty "could be said to reflect the actual loss of" the plaintiff, "*if* ascertained with reasonable certainty." *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1350 (7th Cir. 1994), *on reh'g in part*, 44 F.3d 579 (7th Cir. 1995). Although the defendants suggested factors that the Court could consider when determining a reasonable royalty, they conceded that there is no evidence in the record of the trial regarding most of those factors. The lack of evidence is unsurprising given that the defendants failed to raise this theory until their post-trial motion. Moreover, the defendants do not support their own proposed royalty rate of 1% to 3% of Revolution's gross sales of Diesel Test with any evidence, such as comparable licenses. The defendants note that Curry offered minimal evidence of sales, but they do not attempt to explain how that equates to a royalty rate of 1% to 3%. The Court concludes that the defendants' proposed rate is pure speculation and finds that a royalty rate in this case could not be ascertained with any reasonable certainty.

Second, this case does not involve an infringing advertising campaign, but rather an infringing product name. The Seventh Circuit explained that the district court's finding that "ten percent of [the defendant]'s profits from the sale of Gatorade could be attributed to the advertising campaign that infringed upon [the plaintiff]'s mark" was "methodologically flawed." *Sands*, 34 F.3d at 1350. Because the defendants in this case sold infringing Diesel Test products and never contended at trial that any portion of those sales were attributable to factors other than their infringement, an award of the defendants' profits from those infringing sales is methodologically sound. Indeed, the Seventh Circuit has held in subsequent cases that plaintiffs are entitled to the full amount of defendants' profits from infringing sales established at trial and that courts

need not make "sua sponte reductions" simply because profits awards are "subject to the principles of equity." *4SEMO.com Inc. v. S. Illinois Storm Shelters, Inc.*, 939 F.3d 905, 912 (7th Cir. 2019).

The defendants' contention that any award higher than "$15,000 to $45,000" would be an inequitable windfall under *Sands* lacks merit. Defs.' Rule 59(e) Mot., Opening Mem. at 5. The Seventh Circuit in *Sands* expressly stated its "discomfort with that award was grounded in a concern not so much with the amount of the award but with the approach of the district court." *Sands*, 34 F.3d at 1350. Indeed, the Seventh Circuit "expressed concern that the mere award of a royalty would not be an adequate measure of damages." *Id.* at 1352. Although the defendants contend that Curry did not prove a substantial amount of sales of his products, a plaintiff is not required to prove his sales to be entitled to a defendant's profits. *See Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir. 1989) ("[A]n award of profits was appropriate under either a deterrence or unjust enrichment theory even if plaintiff's actual sustained losses may have been less."); *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir. 1990) (noting that an award of defendants' profits "flow[s] not from the plaintiff's proof of its injury or damage, but from its proof of the defendant's unjust enrichment or the need for deterrence"). The defendants have not cited any authority to the contrary.

The defendants rely heavily on comparisons between the evidence of bad faith in this case and that in *Sands*. But as explained further below in discussing punitive damages, there was stronger evidence of bad faith in this case than in *Sands*. Unlike in *Sands*, the defendants here did not rely on advice of legal counsel. *See Sands*, 978 F.2d at 962. And in *Sands*, there was "no question that [the defendant] developed the

20

'Thirst Aid' campaign entirely independently, with no knowledge of [the plaintiff]'s marks." *Id.* at 963. Here, the parties disputed at trial whether the defendants' knowingly copied Curry's mark. And, in any event, *Sands* is inapplicable to this case for the reasons explained above.

In short, the Court declines to use a reasonable royalty to award defendants' profits. The Court therefore turns to calculating the appropriate amount of defendants' profits using the burden-shifting test outlined in section 1117(a).

As a general matter, "[r]emedies are intended to make violations of the Act unprofitable, but not to act as a penalty." *BASF Corp.*, 41 F.3d at 1092. Disgorgement is appropriate where "damages are otherwise nominal," however, disgorgement in some cases "may overcompensate for a plaintiff's actual injury and create a windfall judgment." *Id.* at 1096 (quoting *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992)); *see also Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 535 (7th Cir. 1989) ("[A]n automatic award of profits in a trademark infringement case could confer a windfall on the plaintiff."). "Therefore, the monetary relief granted by the district court must be great enough to further the statute's goal of discouraging trademark infringement but must not be so large as to constitute a penalty." *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985).

In Curry's motion, he seeks $4.18 million in defendants' profits—$2.05 million from sales of Diesel Test and $2.13 million from sales of Revolution's other products that he contends were marketed, sold, or shipped with Diesel Test. The defendants contend that they experienced a loss on sales of Diesel Test and that the profits from Revolution's other products were not due to their infringement of the Diesel Test mark.

The Court begins with the parties' contentions regarding Revolution's infringing Diesel Test sales. Curry's damages expert, Herman, testified that Revolution's net proceeds from sales of Diesel Test were $2,052,225. He explained that he arrived at that amount by totaling Revolution's sales from various sources, including Amazon, eBay, and Limelight. Where the sales data indicated that certain sales were voided, refunded, or discounted, Herman subtracted those amounts from his gross sales figure to arrive at $2,052,225 in net sales. The Court finds that this evidence was sufficient to establish that the defendants made $2,052,225 in net revenues from sales of Diesel Test. Although Revolution's accountant, Turner, presented his own amount of net sales revenues, the defendants did not contest the accuracy of Herman's calculation of the amount of Diesel Test sales revenue either at trial or in response to Curry's motion.

Curry contends that he is entitled to the full $2.05 million because the defendants failed to prove any expenses related to their sales of Diesel Test products. The Court disagrees. Curry primarily relies on Herman's testimony that the P&L summary is insufficient to prove that "the expenses entered were actually incurred or were recorded accurately." Pl.'s Mem. in Supp. of Pl.'s Mot. for Ct. to Determine Profits at 5. But Turner testified regarding Revolution's process for recording expenses in QuickBooks, which generated the P&L report. Turner explained that every financial transaction is tracked in QuickBooks and that QuickBooks is integrated with Revolution's bank accounts. At the end of each month, Turner testified, Revolution reconciled its bank records with QuickBooks to ensure that the transactions matched. Turner stated that the accounting manager would then double-check the reconciliation. The Court finds this testimony credible, and it supports that the expenses reported on the P&L were

22

actually incurred and were accurately recorded. Indeed, although Herman testified that he did not have sufficient information to verify Revolution's expenses, he also stated that QuickBooks "is a good product" and that he did not believe anyone manipulated or changed the information inputted into QuickBooks. Tr. Vol. 4 at 940:24–941:18.

Furthermore, most of the expenses reported on the P&L summary are supported elsewhere in the record. For example, regarding Revolution's marketing expenses, Barry testified that he was familiar with Revolution's use of affiliated marketing to sell Diesel Test and that it cost approximately $45 to $50 per customer. Herman also agreed based on "listening to testimony" during trial that Revolution incurred marketing expenses. Tr. Vol. 4 at 937:25.

For various overhead expenses—chargeback services, computer expenses, payroll expenses, and rent or lease expenses—Turner testified that these expenses were allocated to Diesel Test based on percentage sales. In other words, because Diesel Test comprised 23% of Revolution's total sales, 23% of Revolution's overhead expenses were allocated to Diesel Test's P&L. Herman testified at trial that he "would suspect" that Revolution did incur overhead expenses, such as payroll, in selling Diesel Test. Tr. Vol. 4 at 938:9–939:1. The Court finds that the defendants presented a reasonable formula for the allocation of overhead. *See In Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 566 (2d Cir. 1994) (holding that a deduction for overhead expense was proper where the defendant "met its burden of offering a reasonable formula," noting that "absolute certainty . . . is not required").

Curry contends that Turner's testimony that he worked for companies other than Revolution shows that the payroll expenses relate to products other than Diesel Test.

This contention does not alter the Court's conclusion. First, as a factual matter, Turner credibly testified that during the period of the P&L report, he did not work for any companies not owned by Revolution. And, in any event, overhead will necessarily include expenses that do not relate specifically to the infringing product, which is why the expenses must be allocated to the infringing sales using a reasonable formula. Curry does not argue that overhead expenses are not properly deductible or that the defendants' allocation formula is unreasonable. Thus, the Court finds that the defendants have satisfied their burden of proof for those expenses.

Regarding Revolution's shipping expenses, Turner testified that Revolution incurred expenses for purchasing boxes to package its Diesel Test products and paid a vendor to ship Diesel Test. Joshua also testified regarding Diesel Test shipments that were sent to supplement distributors. Goodwin, Revolution's warehouse manager, testified about Revolution's fulfillment process, including shipping orders to customers. Even Herman testified that he "would think that there's a shipping cost to somebody when a product is shipped out." Tr. Vol. 4 at 938:3–4. The Court finds that the defendants have established that Revolution incurred shipping expenses and also finds that the amounts presented in the P&L summary for "Shipping & Delivery" and "Packaging Expense" are sufficiently accurate for the reasons explained above.

Similarly, for "Merchant Processing Fees," Turner testified that these fees were the charges imposed by credit card companies. Curry did not present any contrary evidence to contest this expense. He also has not challenged this amount beyond the general contention that the P&L summary is unsupported, a contention the Court has already rejected. The Court finds that the defendants have proven this expense as well.

24

The remaining expenses presented on the P&L are "Cost of Goods Sold" and "Product for Old Co." Dkt. no. 285-1. The Court finds that the defendants have not sufficiently proven these expenses. Turner's testimony about both categories was minimal. For cost of goods sold, Turner simply stated that it "would include what we paid for the Diesel Test product," without any further elaboration. Tr. Vol. 4 at 1002:22–23. Although in the typical case there would logically be some costs associated with manufacturing a physical product, Curry presented evidence at trial that Revolution had the unusual practice of "making" Diesel Test by relabeling its prior Rev Test product. Goodwin testified that at least some of Revolution's Diesel Test sales were actually fulfilled using returns of a prior product, Rev Test, that Revolution relabeled as Diesel Test. She explained that in August 2016, she had made five hundred bottles of Diesel Test this way. Joshua similarly testified that when Revolution began selling Diesel Test, it relabeled existing Rev Test products as Diesel Test. Thus, it is not clear from the record what amount Revolution paid, *if anything*, to manufacture its Diesel Test product specifically. The Court therefore declines to deduct the purported "Cost of Goods Sold" amount.

For the last expense category, "Products for Old Co," no explanation of this amount appears in the record. Turner unhelpfully described this expense as "product that was designated as given to old co." Tr. Vol. 4 at 1003:6–7. Without any further information, the Court cannot evaluate whether this expense is properly deductible as a cost of selling Diesel Test. Thus, the Court also declines to deduct "Products for Old Co."

In sum, the Court finds that Revolution had net sales of $2,052,225 and the

following deductible expenses:  packaging of $25,152.67; chargeback services of $55,763.97; computer, software, and internet of $5,472.99; payroll of $288,576.43, rent or lease of $28,047.05; marketing of $789,290; merchant processing fees of $244,805.07; and shipping & delivery of $68,021.38.  This results in an award of defendants' profits in the amount $547,095.44.

This leaves Curry's request for $2.13 million in sales of Revolution's other products that he contends were marketed, sold, or shipped with Diesel Test.  The Court denies this request on multiple grounds.

First, as the Court instructed at trial, Curry is entitled to recover the defendants' profits from sales of "other products that were marketed, sold, or shipped with their Diesel Test product" only "*if* Mr. Curry proves by a preponderance of the evidence that the defendants profited from their infringement by the sale of [those] other products." Dkt. no. 399-9 at 20:4–10 (emphasis added); *see Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 933 (7th Cir. 2003)  (observing that because "the purpose of allowing suit for the infringer's lost profits is to make infringement worthless to the infringer," a proper award "will sometimes require tracing those profits into another product, as where it is bundled with the infringing product"); *Otis Clapp*, 754 F.2d at 745 ("[T]he plaintiff may not recover if he fails to prove that the defendant's actions caused the claimed harm.").

Although Curry emphasizes in his motion that he presented evidence that Revolution marketed, sold, or shipped other products with Diesel Test, he has not established that the defendants profited from those sales due to the defendants' infringement of Diesel Test.  Rather, Joshua testified that Revolution's other products

were often marketed and sold independently and were established products in the market before Revolution began selling Diesel Test.

Curry did present evidence at trial that Diesel Test products sometimes helped with the sale of Revolution's other products because the products were "complementary," dkt. no. 389-2 at 99:22–100:5. The Seventh Circuit addressed a similar theory of damages in *Bucklew*. In that case, the plaintiff sought the defendant's profits from a noninfringing product on the theory that the defendants' sales of its infringing product attracted customers to purchase a noninfringing product through the prospect of "one-stop shopping." *Bucklew*, 329 F.3d at 933. The Seventh Circuit held that the plaintiff's evidence supporting this theory "was too speculative to sustain an award of damages." *Id.* Although one of the defendant's "employees testified that the infringing forms would indeed help with the sale of" the noninfringing product, "no evidence was presented that would have enabled the market value of this 'help' to be gauged." *Id.* The plaintiff's expert witness testified "that 10 percent of the profits on [the defendant]'s sales of [the noninfringing product] were due to the buyers' being able to buy the infringing forms from" the defendant, but the Seventh Circuit rejected this damages calculation because it "had no factual basis whatsoever." *Id.*

Similarly, in this case, Curry did not present evidence at trial that quantifies the value of complementary products. Although the evidence at trial established that at least some sales of Revolution's other products were bundled with Diesel Test, such as the MRX products that were automatically added to online orders of Diesel Test and some iterations of the Champion Stack bundle, Curry made no attempt to quantify the amount of those specific sales. Instead, Curry seeks the full amount of all Revolution's

sales of MRX and RevTest from August 1, 2016 through October 20, 2017. But his entitlement to all those sales is not supported by the record. And because these are not infringing sales, the usual assumption that "that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was enabled to do so because he was drawing upon the good will generated by that mark" does not apply. *WMS Gaming Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 608 (7th Cir. 2008) (quoting *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07 (1942)), *as amended* (Sept. 16, 2008).

Second, the Court concludes that an award of $2.13 million in sales of Revolution's other products would not be equitable, which is an independent reason to deny the relief Curry seeks. *See* 15 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."). Curry's requested profits award for these products is not required "merely because there has been an infringement." *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 131 (1947). Indeed, the Seventh Circuit has held that disgorgement of profits is not required where, as in this case, it "might have required the district court to engage in undue speculation as to the amount." *BASF Corp.*, 41 F.3d at 1096. The Court finds that its award of $547,095.44 in defendants' profits is "sufficient to render [the defendants'] violations unprofitable," *id.*, and that considerations of "unjust enrichment or the need for deterrence" do not support additional disgorgement of Revolution's other sales, *Web Printing*, 906 F.2d at 1205. Indeed, further disgorgement likely would constitute an impermissible penalty. *See*

*BASF Corp.*, 41 F.3d at 1092; *Otis Clapp*, 754 F.2d at 744 ("[Section] 1117 forbids the district court from allowing recoveries that are so excessive as to amount to a penalty.").

Curry also contends that the Court should use its equitable authority to enhance the profits award.[5]  First, he argues that an enhancement is necessary to ensure that the defendants "do not profit from their infringement."  Pl.'s Mem. in Supp. of Pl.'s Mot. for Ct. to Determine Profits at 11.  Because the Court has concluded that its award is sufficient to ensure that the defendants' infringement is not profitable, it overrules Curry's contention that the Court should enhance the award on that ground.

Second, Curry argues that the award should be enhanced because the defendants concealed their business records.  The defendants contest this characterization of their discovery responses.  The Court has already addressed this issue several times, including when granting Curry's motion *in limine* to exclude unproduced QuickBooks documents.  The Court need not address this issue again because any discovery failures would not justify enhancing the profits award to $4.18 million as Curry seeks.  Curry does not tie any proposed missing records to his request for $4.18 million.  Although he contends that supporting records of expenses were not produced, the Court has concluded that the evidence at trial was sufficient to support the defendants' expenses that it deducted.  Where the evidence was insufficient, the Court did resolve doubts in Curry's favor as he requests by declining to deduct those asserted expenses.  Curry also argues that sales records past October 2017 are

---

[5] In Curry's motion, he asked the Court to enhance the jury's profits award as an alternative to his motion that the Court treat the jury's award as advisory.  Although the Court grants Curry's motion to treat the jury's award as advisory, the Court nonetheless addresses his arguments for an enhancement of the award given that the amount the Court has awarded is similar to the jury's award.

missing. But given the undisputed evidence at trial that any sales past that date were minimal, enhancing the profits award to $4.18 million based on this asserted lack of evidence would improperly penalize the defendants. The Court also notes that when it offered to order a protocol for inspection of the QuickBooks material, Curry expressly advised the Court that he sought "no further relief from the Court on this matter." Dkt. no. 344 at 1.

In short, the Court concludes that an enhancement of the defendants' profits award is not warranted.

To summarize, the Court grants Curry's motion to treat the jury's award as advisory and awards Curry $547,095.44 in defendants' profits. The Court overrules the defendants' contention that an award of this size constitutes an impermissible windfall to Curry.

## B. The defendants' motion to alter the judgment

The defendants have moved under Rule 59(e) to alter or amend the judgment by reducing the profits award and striking the punitive damages award. "Rule 59(e) allows a court to alter or amend a judgment only if the petitioner can demonstrate a manifest error of law or present newly discovered evidence." *Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th Cir. 2008). The defendants premise their motion on five arguments: 1) the jury's profits award provides an inequitable windfall to Curry; 2) the jury's punitive damages award was in error because the jury was not properly instructed on common law trademark rights; 3) the punitive damages award was excessive; 4) the Court erred in instructing the jury on the Nussbaum Family Trust; and 5) the jury was improperly instructed on personal liability. The Court has already addressed the defendants' first

contention in the previous section of this decision.  The Court addresses the remaining contentions in turn.

### 1.    Common law trademark rights instruction

The defendants contend that because the jury was not properly instructed regarding how common law trademark rights arise, the jury could not evaluate willfulness.  But the defendants never made this argument at trial.  When the Court addressed this issue in deciding Curry's motion *in limine*, the defendants contended that Curry must prove that he has enforceable common law trademark rights in certain geographic areas.  The Court overruled this contention because they had already stipulated that Curry had enforceable common law trademark rights that were not limited to any particular geographic area.  *See* Dkt. no. 362 at 4–5.  At trial, the defendants sought an instruction on common law trademark rights and geographic scope, but they never suggested that these instructions were necessary for the jury to determine willfulness.  They also did not object to the willfulness instructions at trial.  Thus, the defendants' contention is forfeited.  *See Schobert v. Illinois Dep't of Transp.*, 304 F.3d 725, 730 (7th Cir. 2002) ("[T]o preserve the objection, the party must state the same grounds when objecting to the jury instruction as it does in its motion for a new trial or on appeal."); *Petkus v. Richland County*, 767 F.3d 647, 654 (7th Cir.2014) ("Although it submitted its own instructions, which the judge declined to give, it failed to object to the instructions that the judge did give.  That was another forfeiture.").

Even if the issue were not forfeited, the Court is not persuaded that the absence of an instruction on common law trademark rights was a "manifest error of law." *Obriecht*, 517 F.3d at 494.  The defendants have not cited any authority for the

proposition that the jury had to be informed regarding how Curry's common law trademark rights developed to properly determine whether the defendants willfully infringed his mark. Moreover, as previously discussed, the defendants' stipulation admitted in substance that Curry had enforceable common law trademark rights nationwide. Thus, instructing the jury regarding "how common law trademark rights arise" or that those rights "are limited to the geographic areas in which a plaintiff establishes such rights through sales" as the defendants propose, Defs.' Rule 59(e) Mot., Opening Mem. at 7, would have been unnecessary and confusing to the jury.

The defendants also contend that the Court erred by not permitted the jury "to consider the effect of the dismissal of the case," *id.*, that is, the earlier dismissal for lack of personal jurisdiction that the Seventh Circuit overturned. When this issue was raised at trial, the Court concluded that evidence that the case was dismissed for lack of personal jurisdiction and then reinstated was inadmissible under Rule 403. It would have caused a significant diversion from the issues of the case to explain the procedural history of the case to the jury, and it risked confusing the jury regarding the implications of the Court's prior dismissal. The defendants do not point to any new considerations that affect the Court's prior ruling. Rather, they simply continue to press their argument that the evidence has substantial probative value. The Court still disagrees. The defendants contend that the fact that the defendants did not sell Diesel Test products while the case was dismissed shows a lack of malice, but the evidence at trial showed that the defendants *did* continue selling Diesel Test during at least part of that time. Thus, although the evidence may have some probative value, as the Court acknowledged at trial, it is minimal and significantly outweighed by the other factors the

Court noted.

Because the Court concludes that the jury was properly instructed, it denies the defendants' motion to overturn the jury's finding of willfulness and its award of punitive damages on this ground.

## 2. Punitive damages

In the alternative, the defendants renew, in a footnote, their motion for judgment as a matter of law in their favor on punitive damages because they contend that there was insufficient evidence of their reckless disregard for Curry's rights.

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis" to support a verdict for the nonmovant. Fed. R. Civ. P. 50(a)(1), (b). On a Rule 50(b) motion, a court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). "That includes drawing all reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe." *May v. Chrysler Group, LLC*, 716 F.3d 963, 971 (7th Cir. 2012). Courts are "obliged to review the record to ensure that sufficient evidence exists to support the verdict, but [courts] will not otherwise consider the weight of the evidence" or "reevaluate the credibility of witnesses." *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 515 (7th Cir. 1993). Consequently, a jury verdict will be overturned only if the court concludes that "no rational jury could have found for the prevailing party." *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (internal quotation

marks omitted).

As the jury was instructed, it could award punitive damages only if it found that "the defendants' acts were willful and malicious or were in reckless disregard of Mr. Curry's rights." Dkt. no. 399–9 at 21:1–9. The defendants do not contend that this instruction was improper, nor did they object to the instruction at trial.

There was ample evidence to support the jury's decision to impose punitive damages in this case. For starters, the jury reasonably could have agreed with Curry that the similarities between his mark and the defendants were too significant to be a coincidence and that the defendants intentionally copied Curry's mark. Moreover, in response to Curry's cease-and-desist request, the defendants decided to ignore it and "let him sue" while they continued to sell their infringing products. Dkt. no. 399-3 at 65:19–21. The defendants also continued selling Diesel Test even after it was banned on Amazon and Curry had filed suit.

In contending that the evidence reflected that they acted in good faith, the defendants point to their testimony that they engaged in "extensive searches" in response to Curry's cease-and-desist requests. Defs.' Rule 59(e) Mot., Opening Mem. at 6. But the defendants did not offer any records of these searches. Curry argued at trial that had the defendants performed the searches as they contended, they would have discovered his product. The credibility of the defendants' testimony on this point was for the jury to assess, not the Court. *See Venson v. Altamirano*, 749 F.3d 641, 647 (7th Cir. 2014) ("[T]he credibility of the officers' testimony . . . was for the jury, not us, to assess."); *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) ("Since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a

new trial merely because the evidence was sharply in conflict.") (alteration accepted) (internal quotation marks omitted).

In short, the Court denies the defendants' motion in the alternative for judgment as a matter of law in their favor on punitive damages.

The defendants also contend that the jury's punitive damages award is "grossly excessive" and must be reduced. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). "The Supreme Court, in testing awards of punitive damages for compliance with due process, has established three guideposts: (1) the reprehensibility of the defendant's conduct; (2) the disparity between the actual harm suffered and the punitive award; and (3) the difference between the award authorized by the jury and the penalties imposed in comparable cases." *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1140 (7th Cir. 2020) (internal quotation marks omitted).

To determine the reprehensibility of the defendants conduct, the Court considers whether: (1) "the harm caused was physical as opposed to economic;" (2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;" (3) "the target of the conduct had financial vulnerability;" (4) "the conduct involved repeated actions or was an isolated incident;" and (5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 1141.

The defendants do not expressly address any of the five factors the Seventh Circuit has instructed courts to consider on the first guidepost. Instead, they assert that they "inadvertently ran afoul of another's trademark," which is "not a reprehensible act,"

and they note in passing that their infringement did not cause any physical injury.[6] Defs.' Rule 59(e) Mot., Opening Mem. at 9.  Contrary to the defendants' characterization of their infringement as a "mistake," *id.*, the Court has already concluded above that the evidence supports that their infringement was not a "mere accident," *Epic*, 980 F.3d at 1141.  For the remaining three factors, the defendants do not contest that each factor weighs in favor of the jury's punitive damages award.

The parties primarily contest the second guidepost.  This requires the Court to "analyze the ratio of punitive damages to the 'harm, or potential harm' inflicted on the plaintiff."  *Id.* at 1142 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424 (2003)).  The defendants contend that Curry's harm was $2,500 and the punitive damages award is $900,000, making the ratio 360:1.

For starters, Curry contends that the ratio calculation must be calculated on a per-defendant basis, in other words, based on the award against each defendant of $300,000, not the aggregate total of $900,000.  *See Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 960 (9th Cir. 2005) ("[T]o compare the amount of compensatory damages awarded to one plaintiff with the total amount of punitive damages awarded to that plaintiff from all defendants shifts the focus away from a particular defendant's conduct to the defendants' conduct *en grosse*.").  The defendants do not respond to this contention, thereby forfeiting the issue.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to

---

[6] Curry contends that this factor still weighs in his favor because he experienced mental and emotional distress.  Because the defendants do not contest that the other four factors support the jury's award of punitive damages, the Court need not resolve the parties' dispute on this point.

respond to an argument . . . results in waiver.").

The more difficult issue is the proper amount of harm to include in the ratio. Curry contends that the ratio should include the defendants' profits award. The defendants argue that because that award is distinct from the award for his actual harm, it should not be included.

"In most cases, the compensatory-damages award approximates the plaintiff's harm." *Epic*, 980 F.3d at 1142. The Seventh Circuit has noted, however, that computing the appropriate ratio may "pose a challenging task" where damages are "based on the benefit to [the defendant], not because of any harm suffered by" the plaintiff. *Id.* at 1143. Although the Seventh Circuit did not have to reach the issue in *Epic*, it noted that "at least one other court has compared an unjust enrichment award to the punitive-damages award under this guidepost when state law allowed punitive damages to be imposed for the underlying claim." *Id.*; *see also Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1351 (Fed. Cir. 2001) ("[T]he unjust enrichment gained by DeKalb is logically related to the harm or potential harm caused RPA, and it was appropriate to base the award of punitive damages on the unjust enrichment award."), *vacated*, 538 U.S. 974 (2003), *reinstated as modified,* 345 F.3d 1366 (2003); *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993) ("It is appropriate to consider . . . the possible harm to other victims that might have resulted if similar future behavior were not deterred."). Because the defendants' profits award stems from considerations of unjust enrichment and deterrence, *Web Printing*, 906 F.2d at 1205, the Court concludes that it is properly included as potential harm in the ratio.

In sum, the proper ratio is $547,095.44 in defendants' profits plus $2,500 in

actual damages, for a total of $549,595.44, to the per-defendant punitive damages award of $300,000.  Thus, the ratio is less than 1:1, which "is easily permissible." *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004).

The final guidepost is "the difference between the punitive award authorized by the jury and civil penalties imposed in comparable cases."  *Epic*, 980 F.3d at 1145.  The defendants cite a few cases with lower punitive damages awards.  "But even if the punitive award is higher than those in comparable cases, this guidepost generally deserves less weight than the other two."  *Rainey v. Taylor*, 941 F.3d 243, 255 (7th Cir. 2019).  Having found that the ratio is in the easily permissible range, the third guidepost does not alter the Court's conclusion that the jury's punitive damages award is not excessive.  *See id.* ("We are reluctant to overturn the punitive damages award on the basis of the third guidepost alone." (alterations accepted) (quoting *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 238 (3d Cir. 2005))).

In sum, the Court denies the defendants' motion to reduce the jury's punitive damages award.

### 3.     Nussbaum Family Trust instruction

Next, the defendants contend that the jury instruction that "[w]hether and the extent to which you consider the Nussbaum Family Trust in assessing each defendants' financial condition are matters for you to decide" was improper for two reasons.  Dkt. no. 399-9 at 22:12–14.

First, the defendants contend that it "effectively allowed the jury to pierce the corporate veil [sic] by considering the Trust's assets to be the assets of Defendants for purposes of determining the punitive damage award, without ever instructing the jury on

the necessary standards to allow the corporate veil [sic] to be pierced."  Defs.' Rule 59(e) Mot., Opening Mem. at 12.  But any argument that the Court should have instructed the jury on the circumstances under which the jury could "pierce the corporate veil" is forfeited.  This objection was not made at trial.  *See* Dkt. no. 385-1 at 1094:3–5 ("And I think the issue that defendants raise is not that it's incorrect but rather that it's calling attention to it.").  Nor was it made in the defendants' filed written objections to the Court's instructions.  *See* Dkt. no. 373.  Indeed, Curry proposed an instruction at trial regarding the circumstances under which the jury could consider the trust, and the defendants objected.  Thus, the defendants' first contention regarding this instruction is forfeited.  *See Schobert*, 304 F.3d at 730.

The defendants' second reason is the same as the objection they made at trial, namely, that the instruction improperly brought attention to the trust.  As the Court explained at trial, the instruction was necessary because the parties disputed whether the jury should consider the trust and evidence regarding the trust comprised a substantial amount of the evidence introduced at trial.  And this was not the only place where the instructions addressed how the jury should consider particular evidence.  In particular, the jury instructions stated that the jury did not have to accept the testimony of Curry's expert witness, Herman.  In overruling the defendants' objection at trial, the Court also emphasized that the instruction was neutrally worded.

In their motion, the defendants do not contest any aspects of the Court's prior reasoning.  Rather, they argue that their failure to object to the instruction about expert testimony "does not waive or diminish" their objection to the trust instruction.  Defs.' Rule 59(e) Mot., Opening Mem. at 12.  But this does not engage with the logic of the

39

Court's reasoning. The defendants also do not cite any authority for the proposition that instructing the jury in a neutral way that it had to decide whether and the extent to which it should consider a specific subject of evidence could constitute a manifest error of law. Thus, the Court concludes that the instruction regarding the Nussbaum Family Trust was not improper and that giving the instruction cannot be grounds for altering the judgment.

### 4. Personal liability instruction

Lastly, the defendants contend that the personal liability instruction was improper. They continue to press the argument that to be individually liable, the officers must act outside the scope of their duties or misuse the corporate form. As the Court held in denying their motion for summary judgment, this is not the law. *See Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 994 (7th Cir. 2004) ("[T]here is some evidence that Warner may have been personally involved in the decision to use the name Niles on a Ty camel, and if so he may be . . . a joint tortfeasor and therefore suable."); *Weller Mfg. Co. v. Wen Prods., Inc.*, 231 F.2d 795, 801 (7th Cir. 1956) (finding individual liability where "[t]his individual admitted that he was at all times in control of the administrative and managerial policy of the corporation" and "had before him the Weller device when he designed his infringing gun, which he deliberately made identical with Weller"). "Indeed, courts in this district have rejected the argument that even if an officer personally participates in the manufacture or infringement, such acts cannot lead to liability unless they fall outside of the officer's job description." *UIRC-GSA Holdings Inc. v. William Blair & Co., L.L.C.*, No. 15 C 9518, 2017 WL 3593117, at *4 (N.D. Ill. Aug. 21, 2017) (internal quotation marks omitted). The Court concludes that the jury

instruction on personal liability was proper and therefore denies the defendants' motion to alter the judgment on this ground.[7]

In sum, the Court denies the defendants' Rule 59(e) motion.

**C.      Curry's motion for a finding of IUDTPA liability**

Curry has moved for the Court to find the defendants liable for violating the IUDTPA. Curry's state unfair competition claim—which is what the IUDTPA claim is— "mirrors" the federal "infringement analysis." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir. 1993); *UL LLC v. Am. Energy Prod., LLC*, 358 F. Supp. 3d 753, 758 n.2 (N.D. Ill. 2019) (Kennelly, J.) (noting that IUDTPA claims "are subject to precisely the same standards as [ ] federal infringement claims"). Curry contends that because the defendants stipulated that Revolution is liable for infringement and the jury found that all the defendants willfully infringed Curry's mark, the Court should also find that the defendants willfully violated the IUDTPA.

As a preliminary matter, the defendants argue that they should not be found liable because Curry does not have common law trademark rights in Illinois. Although the defendants concede that they stipulated that Revolution was liable for Counts III and

---

[7] At some points in their motion, the defendants appear to argue that the evidence at trial did not establish that Joshua and Barry were personally liable even under the proper standard. But this argument, assuming it was clearly asserted, is forfeited because it was not raised as grounds for their Rule 50(a) motion made at trial. Rule 59(e) "may not be used . . . to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008); *see also ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96 (2d Cir. 2014) ("[W]e do not believe that the Rule permits a party to obtain judgment as a matter of law under Rule 59(e) after failing to comply with the carefully crafted structure and standards of Rules 50 and 51."). In any event, the Court explains below in addressing Curry's IUDTPA claim that the evidence sufficiently established Joshua and Barry's personal liability.

V, they argue that they refused to stipulate to liability on Curry's IUDTPA claim in order to retain their right to contest that Curry had enforceable rights in Illinois. This contention cannot be reconciled with the stipulation. The defendants stipulated that "Revolution is liable for infringing Plaintiff's Diesel Test mark under Count III and Count V of Plaintiff's Complaint." Dkt. no. 156 at ¶ 2. Count V of the complaint, in turn, states that "Defendants' acts constitute trademark infringement in violation of the common law of the State of Illinois." Dkt. no. 1 at ¶ 76. Given this context, the stipulation straightforwardly admits that Curry has enforceable common law trademark rights in Illinois. As the Court explained in granting Curry's motion *in limine*, Revolution could not conceivably be liable for violating the Illinois common law of trademark infringement if Curry did not have enforceable common law trademark rights in Illinois.

That said, under "the long-standing rule of construction in Illinois," "a statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 184–85, 835 N.E.2d 801, 852 (2005) (internal quotation marks omitted). No such intent is expressed in IUDTPA. *See IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 191 F. Supp. 3d 790, 807 (N.D. Ill. 2016) (Kennelly, J.). Curry is therefore required to show that "the circumstances relating to [his] disputed transactions with [the defendants] occurred primarily and substantially in Illinois." *Avery*, 216 Ill. 2d at 187, 835 N.E.2d at 854. To make this determination, courts consider the following factors: "(1) the plaintiff's residence, (2) where the misrepresentation was made, (3) where the damage to the plaintiff occurred, and (4) whether the plaintiff communicated with the defendant in Illinois." *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009) (citing

*Avery*, 216 Ill. 2d at 186–88, 835 N.E.2d at 853–54).

First, it is undisputed that Curry's residence is in Illinois. Because he resides in Illinois, the damage analyzed under the third factor occurred in Illinois. *See Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16 C 3401, 2022 WL 910862, at *3 (N.D. Ill. Mar. 29, 2022) ("Courts in this district have found that when the plaintiff resides in Illinois, damages are often suffered in Illinois.").

Second, the misrepresentation, namely, the defendants' use of Curry's mark, occurred in Illinois. Joshua testified at trial that Revolution sold its Diesel Test product to hundreds of customers in Illinois. Although the defendants sold their products in other states as well, there is no requirement that the sales be exclusively in Illinois. *See id.* (finding that this factor weighed in the plaintiff's favor where "the evidence showed[] that HBI's false advertising claims occurred nationwide, including in Illinois"); *Specht*, 660 F. Supp. 2d at 866 (holding that the plaintiff stated a IUDTPA claim where "[t]he alleged infringement took place on the Internet and was international in scope, presumably occurring in Illinois"). In contending that this factor weighs in their favor, the defendants argue that Curry failed to establish that he had trademark rights in Illinois or that he made sales in Illinois. But, as explained above, the defendants—despite their contention to the contrary—stipulated to this via their stipulation to liability on this claim. Given the stipulation, Curry was not required to provide evidence of his sales for this factor to weigh in his favor. The defendants do not cite any authority to the contrary.

Lastly, Curry communicated with the defendants via Facebook in Illinois. Although the defendants assert that they could not have known Curry's location through his Facebook message, they do not cite any authority for the proposition that their

43

knowledge of Curry's location is relevant to the analysis.

In short, the Court finds that each factor weighs in favor of finding that the defendants' misconduct occurred "primarily and substantially" in Illinois.

The defendants assert two other arguments against liability, but the Court has already rejected both. First, they again contend that neither Joshua nor Barry can be held individually liable because they did not act outside their scope of duties as officers. As stated earlier, to be held individually liable, the evidence need only show that Joshua and Barry "personally participate[d]" in the infringement. *4SEMO.com*, 939 F.3d at 912–13 ("A corporate officer is individually liable if he 'personally participates in the manufacture or sale of the infringing article, uses the corporation as an instrument to carry out his own willful and deliberate infringements, or knowingly uses an irresponsible corporation with the purpose of avoiding personal liability.'" (alterations accepted) (quoting *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926))).

The evidence at trial established that Joshua personally participated in the infringement. Joshua decided to use the Diesel Test name, was involved in creating the label, managed the sales of Diesel Test, made the decision to continue selling Diesel Test after Curry's cease-and-desist request, and attempted to register for a federal trademark on Diesel Test after learning of Curry's common law trademark. The defendants' characterizations of Joshua's activities as "generic," Defs.' Opp. to Pl.'s IUDTPA Mot. at 11, is incorrect.

The evidence was also sufficient to establish Barry's personal liability. He consulted with Joshua on the Diesel Test name, was involved in the decision to ignore Curry's cease-and-desist request, and encouraged Joshua's filing of Revolution's Diesel

Test trademark application. Contrary to the defendants' assertion, the evidence established Barry's involvement beyond merely failing to stop the infringing sales.

Next, the defendants contend that the Court should find that the defendants did not act willfully because the jury was improperly instructed. The Court has already concluded that the jury was properly instructed on willfulness and that the evidence was sufficient to support the jury's finding. The defendants' arguments for why the Court should nonetheless find that they did not act willfully are unpersuasive. First, they again point to their decision to stop selling Diesel Test while the case was dismissed. But this assertion is contrary to the evidence presented at trial that the defendants did continue making infringing sales for months after the case was dismissed. Second, they also emphasize their searches that informed their claimed good-faith belief that Curry did not have any trademark rights. But, as noted above, the defendants did not produce any evidence of these searches aside from their testimony. The Court, like the jury, finds the testimony on this point to lack credibility. In Joshua's email asking a Revolution employee to perform a search, he also "vote[d] to let [Curry] sue" while they sold their remaining Diesel Test products. Dkt. no. 399-3 at 65:19–21. This suggests that the defendants had already decided they would continue selling their infringing product regardless of the outcome of any searches performed.

The defendants contend that Curry's willfulness argument is predicated on their decision not to stop selling immediately after receiving his cease-and-desist request. But this characterization is incorrect. The record at trial contained further evidence of willfulness as previously described, including that the defendants did not perform adequate searches in response to Curry's cease-and-desist letters and continued to sell

45

their infringing products even after Amazon's ban.

Moreover, the defendants do not cite any authority for the proposition that deciding to continue infringing despite Curry's cease-and-desist requests cannot sustain a willfulness finding. They contend that in the patent infringement context, "the mere fact that an accused infringer continues its infringing activity cannot support a finding of willfulness where the accused infringer presents legitimate defenses and did not know of the asserted patents until the filing of the suit." Defs.' Opp. to Pl.'s IUDTPA Mot. at 14 (quoting *Civix-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 2d 869, 903 (N.D. Ill. 2005)). But the defendants did know of Curry's mark before he filed suit. Moreover, the Federal Circuit requires an accused infringer with notice to exercise "due care to avoid infringement" which, as stated above, the defendants failed to do in this case. *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1351 (Fed. Cir. 2001). The fact that the accused infringer "presents a non-frivolous defense to infringement" does not preclude a willfulness finding. *Id.*

In sum, the Court concludes that the evidence at trial establishes by a preponderance of the evidence that the defendants willfully violated the IUDTPA. *See Bingham v. Inter-Track Partners*, 234 Ill. App. 3d 615, 621, 600 N.E.2d 70, 75 (1992) (finding willfulness where "the defendant made a reasoned, deliberate business decision to proceed with [the trademark] despite plaintiffs' protest").

## D. Curry's motion for pre- and post-judgment interest

Curry has also moved under Rule 59(e) to amend the judgment to include pre- and post-judgment interest. The defendants do not object to Curry's request for post-judgment interest, and the Court notes that post-judgment interest applies by operation

46

of law.  *See* 28 U.S.C. § 1961(a).  Regarding Curry's motion for prejudgment interest, the defendants only contest the proper rate and the applicable period.

Curry contends that the defendants should pay prejudgment interest at the prime rate plus 2%.  The defendants contend that an increase above the prime rate is unwarranted.  The Court agrees.  The Seventh Circuit has repeatedly stated that the prime rate is the preferred rate for awarding prejudgment interest.  *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) ("[W]e suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate."); *First Nat. Bank of Chi. v. Standard Bank & Tr.*, 172 F.3d 472, 480 (7th Cir. 1999) ("We hold today that to . . . award something other than the prime rate is an abuse of discretion, unless the district court engages in such a refined calculation."); *Matter of Oil Spill by Amoco Cadiz Off Coast of France*, 954 F.2d 1279, 1332 (7th Cir. 1992) ("[U]nless it engages in such refined rate-setting, a court should use the 'prime rate' . . . .").

Curry contends that a prime rate-plus formula is necessary because the defendants are distressed borrowers.  But the Seventh Circuit has acknowledged that the prime rate, as "a market-based estimate," "may miss the mark for any particular party."  *Matter of Oil Spill*, 954 F.2d at 1332.  Still, the Seventh Circuit has encouraged application of the prime rate because it "is a readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default."  *Gorenstein*, 874 F.2d at 436.  The Court concludes that the prime rate is the appropriate rate of prejudgment interest in this case.

Curry argues that district courts are permitted to engage in "refined rate-setting." *First Nat. Bank of Chi.*, 172 F.3d at 480. But even so, he acknowledges that the decision to award pre-judgment interest at a rate above the prime rate "is fully within the Court's discretion." Pl.'s Reply in Supp. of Mot. for Interest at 5. The Court declines to exercise its discretion to engage in such rate-setting, especially where Curry's proposed 2% increase itself does not appear to be the result of "refined rate-setting." Among other things, Curry does not point to any interest rates charged on the defendants' loans as evidence for his 2% adjustment. *See Matter of Oil Spill*, 954 F.2d at 1332 (noting that "a court could draw an interest rate directly from" the defendant's "publicly traded notes and debentures"). Rather, he asserts that it is his "conservative estimate." Pl.'s Mem. in Supp. of Mot. for Interest at 7.

Regarding the applicable time period, the defendants contend that it should exclude the time during which the case was dismissed and the period when the trial was rescheduled. But they do not cite any authority for their position. Rather, "prejudgment interest typically accrues from the date of the loss or from the date on which the claim accrued." *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 935 (7th Cir. 2003); *see also W. Virginia v. United States*, 479 U.S. 305, 311 n.2 (1987) ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress."). Because excluding the time as the defendants suggest would undercompensate Curry, the Court declines to do so. *See City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995) ("The essential rationale for

48

awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss."). The Court therefore awards prejudgment interest at the prime rate beginning with the date of the first known infringing sale, which the defendants do not dispute is October 19, 2016.

Curry contends that, in the event the Court later awards attorney's fees, the Court should also award prejudgment interest on the amount of attorney's fees. Because no motion for attorney's fees has yet been filed, the Court declines to address this issue at this juncture. Curry contends that "there is no doubt he will seek attorneys' fees." Pl.'s Reply in Supp. of Mot. for Interest at 13. If so, the Court will address the issue in connection with that motion. The Court overrules Curry's contention that the defendants "have forfeited any substantive objection" to this by correctly arguing that the matter is not yet ripe. *Id.*

The parties agree on the applicable formula for calculating interest. Because the Court has modified the profits award, the parties are directed to calculate prejudgment interest using the prime rate from October 19, 2016 through September 1, 2023 and submit a joint status report with the calculation and figure by August 30, 2023.

**E.    Curry's motion for a permanent injunction**

Lastly, Curry has moved under Rule 59(e) for the Court to enter a permanent injunction.

To be entitled to a permanent injunction, Curry must establish: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

49

warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Court concludes that each factor is met in this case.

First, the Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001). In this case, the defendants stipulated to actual confusion, and the jury found that Curry's goodwill was damaged by the defendants' infringement. Moreover, Curry's trademark and the defendants' "infringing use are identical, [ ] the products are the same, and [ ] the markets are the same," which are factors "indicative of irreparable injury." *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979). The Court concludes that Curry has established irreparable injury and that "[m]onetary damages are likely to be inadequate compensation for such harm." *Id.* at 1026. Given the Court's conclusion, it need not address the parties' dispute regarding whether there is a presumption of rebuttable harm in trademark actions. *See Chi. Mercantile Exch. Inc. v. Ice Clear US, Inc.*, No. 18 C 1376, 2021 WL 3630091, at *29 (N.D. Ill. Aug. 17, 2021) (Kennelly, J.) (concluding that "there does not appear to be a basis for applying a one-off rule regarding presumed harm in trademark cases").

The defendants contend that the first factor for issuance of an injunction is not met because they have stopped infringing, relying on this Court's decision in *Chicago Mercantile Exchange*. But in that case, the defendants had "stopped using the [infringing] mark and there [wa]s no evidence in the record to suggest otherwise." *Id.* at 30. In this case, by contrast, there was evidence in the record contradicting the

defendants' assertion that they voluntarily stopped using Curry's trademark in 2018. For example, Curry testified to seeing advertisements for Revolution's Diesel Test as late as 2020. Moreover, the evidence at trial established that the defendants created new products by simply relabeling old products, which suggests that it would be particularly easy for them to infringe again. *See United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275 (7th Cir. 2009) ("The court may consider how easily former practices might be resumed at any time in determining the appropriateness of injunctive relief.").

Next, the Court concludes that the balance of hardships favors Curry. If it is true, as the defendants contend, that they stopped selling Diesel Test in 2018, then it is unclear what hardship an injunction would impose on them. Indeed, the defendants did not clearly articulate any hardship, contending instead that Curry's "trademark rights are not permanent" and are limited in geographic scope. Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 4–5. Though this contention arguably casts doubt on the believability of their assertion that they have no "intention of utilizing the Diesel Test mark in any capacity whatsoever," *id.* at 5, it does not establish any hardship.

Lastly, a permanent injunction would serve the public interest. "[T]he public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000); *see also Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 19 (7th Cir. 1992) ("[Injunctive] relief would serve, rather than disserve, the public interest in truthful advertising, an interest that lies at the heart of the Lanham Act."). In contending that the public interest would be disserved, the defendants argue that "any injunction would need to account for the scenario of [Curry]'s loss of rights." Defs.' Opp. to Pl.'s Mot. for

Permanent Inj. at 5. But the defendants do not cite any authority for this proposition. Nor do the defendants explain how an injunction might take Curry's potential "loss of rights" into account. Rather, the defendants contend that an injunction is not necessary because "[i]f Curry has trademark rights, that is sufficient to prevent Defendants from using the mark." *Id.* This contention is unpersuasive given the jury's finding of willful infringement. Moreover, adopting the defendants' position essentially would mean that an injunction never serves the public interest in a trademark case, which is not the law.

In sum, the Court concludes that Curry is entitled to a permanent injunction.

Curry requests that the Court enter an injunction incorporating the terms of the preliminary injunction and including a few additional terms. The defendants object to several of the proposed terms.

First, Curry's proposed injunction would cover trademarks that were not asserted at trial. The defendants contend that the injunction should be limited to Diesel Test. Neither party provides any authority on the issue of whether, or under what circumstances, related marks not asserted at trial can be included in an injunction. Curry cites *Ariel Investments, LLC V. Ariel Capital Advisors LLC*, No. 15 C 3717, Dkt. 199-1 ¶ 2(a) (N.D. Ill. Mar. 9, 2017), but the related marks in that case were raised at trial.

Although the preliminary injunction in this case included related marks, Curry did not litigate a theory of a family of marks after that point. Curry contends that the defendants should not be able to infringe Curry's "other marks in the 'Diesel' family." Pl.'s Reply in Supp. of Mot. for Permanent Inj. at 12. But he never attempted to establish that he had a family of "Diesel" marks. *See AM Gen. Corp. v. DaimlerChrysler*

52

*Corp.*, 311 F.3d 796, 819 (7th Cir. 2002) ("[T]he proponent of a family of marks must prove that, prior to the junior user's entry, all or many of the marks in the alleged family were used and promoted in such a way as to create public perception of the family mark as an indicator of source.") (internal quotation marks omitted). Given Curry's decision to pursue only the Diesel Test mark at trial, the permanent injunction will be limited to Diesel Test accordingly.

Next, Curry contends that the injunction should require the defendants to withdraw their pending opposition to Curry's federal trademark application for Diesel Test. The defendants' objection to this proposal is hard to follow. They contend that their opposition to Curry's federal trademark application is warranted because it is "solely focused" on Curry's attempt to trademark the word "Test" apart from "Diesel Test." Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 10. But Curry's application is for the phrase "Diesel Test," not simply "Test." The opposition that the defendants attach to their motion also plainly asserts further objections to Curry's application. *See* Dkt. no. 398-2. The Court therefore grants Curry's request to include this in the injunction.

Without citing relevant authority, the defendants raise various other objections, none of which have merit. First, the defendants contend that the proposed injunction is too broad because it is not limited to "testosterone boosting nutritional supplement" goods specifically. Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 7. Limiting the injunction in this manner is unwarranted, however, given the evidence at trial that the defendants sold other kinds of goods displaying their brand names to develop their brand.

Second, the defendants argue that Curry's "requests for certifications and

53

delivery of labels and signs are unnecessary." *Id.* at 7. But the defendants concede that Curry's requests for certifications and materials bearing Curry's mark is permitted by 15 U.S.C. § 1116(a). Moreover, their assertion that this proposed term is "nothing but busy work" because Revolution stopped selling infringing products years ago, *id.* at 8, is unpersuasive given the dispute at trial regarding when the defendants stopped infringing Curry's mark. The defendants do not cite any authority for the proposition that they must retain all such materials as litigation documents.

Finally, the defendants contend that the proposed injunction is not sufficiently definitive in part because it precludes any trademark that is "confusingly similar" to Curry's mark. Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 9. But the defendants themselves state that this requirement "is just a reiteration that [they] are prohibited from violating trademark law." *Id.* at 9. The Court concludes that this language is not impermissibly vague. *See Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384 (7th Cir. 2018) ("The Lanham Act's prohibition on implied falsehoods makes the use of somewhat inexact language unavoidable.").

The defendants also object on vagueness grounds to Curry's proposed term prohibiting the defendants from "doing any other act likely to induce the mistaken belief that Curry is the source of products that are not actually manufactured or sold by Curry." Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 9. Curry does not respond to this objection, thereby forfeiting the point. *See Bonte*, 624 F.3d at 466. The Court therefore will exclude this term from the injunction.

In sum, the Court grants Curry's motion to enter a permanent injunction in accordance with this decision.

**Conclusion**

For the foregoing reasons, the Court (1) grants plaintiff Curry's motion to determine infringing profits and awards $547,095.44 in defendants' profits [dkt. no. 388]; (2) denies the defendants' motion to amend or alter the judgment [dkt. no. 384]; (3) grants plaintiff Curry's motion for a finding of IUDTPA liability [dkt. no. 378]; (4) grants in part plaintiff Curry's motion for pre- and post-judgment interest [dkt. no. 390]; and (5) grants in part plaintiff Curry's motion for a permanent injunction [dkt. no. 392]. The parties are directed to calculate prejudgment interest in accordance with this decision through September 1, 2023 and submit a joint status report with the calculation and amount by August 30, 2023. Finally, plaintiff is directed to provide a Word version of the proposed injunction, modified as indicated in this decision, to the undersigned judge's proposed order e-mail address by August 30, 2023.

MATTHEW F. KENNELLY
United States District Judge

Date: August 23, 2023